# IN THE SUPREME COURT OF IOWA

No. 17–1592

Filed June 29, 2018

**GREGORY BALDWIN,**

Appellee,

vs.

**CITY OF ESTHERVILLE, IOWA; MATT REINEKE,** Individually and in his Official Capacity as an officer of the Estherville Police Department; and **MATT HELLICKSON,** Individually and in his Official Capacity as an officer of the Estherville Police Department,

Appellant.

---

Certified questions of law from the United States District Court for the Northern District of Iowa, Mark W. Bennett, United States District Court Judge.

Plaintiff seeks damages for alleged violations of his rights under article I, section 1 and article I, section 8 of the Iowa Constitution following his arrest under city ATV ordinances. **CERTIFIED QUESTION ANSWERED.**

Douglas L. Phillips and René Charles LaPierre of Klass Law Firm, LLP, Sioux City, for appellants.

Jack Bjornstad of Jack Bjornstad Law Office, Okoboji, for appellee.

Thomas J. Miller, Attorney General, Jeffrey S. Thompson, Solicitor General, Julia S. Kim, Assistant Attorney General, for amicus curiae State of Iowa.

Thomas M. Boes and Catherine M. Lucas of Bradshaw, Fowler, Proctor & Fairgrave, P.C., Des Moines, for amicus curiae Iowa Communities Assurance Pool.

Katie Ervin Carlson of Fiedler & Timmer, P.L.L.C., Johnson, Jessica Zupp of Zupp and Zupp Law Firm, P.C., Denison, and Joel E. Fenton, Law Offices of Joel E. Fenton, PLC, Des Moines, for amicus curiae Iowa Association for Justice.

**MANSFIELD, Justice.**

After receiving citizen complaints about the operation of an ATV within city limits, police officers reviewed a video of the event, examined the city's ordinances, and concluded an ordinance had been violated. They sought and obtained an arrest warrant from a magistrate and arrested the ATV operator. An Iowa district court later dismissed the criminal case against the operator, however, finding that no ordinance actually prohibited his conduct.

Thereafter, the ATV operator brought damages claims against the city and the police officers for common-law false arrest, deprivation of civil rights under 42 U.S.C. § 1983 (2012) based on a violation of the Fourth Amendment, and directly under article I, sections 1 and 8 of the Iowa Constitution. The case was removed to federal court, where the federal district court granted summary judgment to the defendants on the common law and federal constitutional claims. The federal district court reasoned that the police officers were acting pursuant to a facially valid warrant, and it was not clearly established that the ATV operator's conduct did not violate an ordinance.

We have now been asked by the federal district court to answer the following certified question of Iowa law relating to the Iowa constitutional claims: "Can a defendant raise a defense of qualified immunity to an individual's claim for damages for violation of article I, § 1 and § 8 of the Iowa Constitution?"

For the reasons discussed herein, we answer this question as follows: A defendant who pleads and proves as an affirmative defense that he or she exercised all due care to conform with the requirements of the law is entitled to qualified immunity on an individual's claim for damages for violation of article I, sections 1 and 8 of the Iowa Constitution.

## I. Background Facts and Proceedings.

When we answer a certified question, we rely upon the facts provided with the certified question. *See Bd. of Water Works Trs. of Des Moines v. Sac Cty. Bd. of Supervisors*, 890 N.W.2d 50, 53 (Iowa 2017); *Life Inv'rs Ins. Co. of Am. v. Estate of Corrado*, 838 N.W.2d 640, 643 (Iowa 2013). Accordingly, we restate the facts as set forth by the federal district court:

> The incidents giving rise to Baldwin's claims began on Sunday, November 10, 2013. At approximately 2:30 p.m. that day, Officers Reineke and Hellickson were on patrol in the City when they received a dispatch to report to the Law Enforcement Center concerning a "4 wheeler complaint." They drove to the Law Enforcement Center. Upon their arrival, they spoke with Tenner and Patti Lilland, who live in the Estherville area. Mr. Lilland showed the officers a video of a 4–wheeler riding in the ditch on the south side of North 4th Street. The officers were able to identify the driver of the ATV as Greg Baldwin. They watched the ATV proceed along North 4th Street and turn into a ditch, using the north Joe Hoye Park entrance, after which it continued in the ditch until it reached West 14th Avenue North, where it returned to the roadway. Baldwin acknowledges that he was operating his ATV/UTV on that date in the south ditch of North 4th Street and on North 4th Street, and the parties agree that the ditch and street are within the City's limits. Baldwin does not recall using the north Joe Hoye Park entrance to enter the ditch.
>
> Officers Reineke and Hellickson reviewed Iowa Code Ch. 321I, because the City did not reproduce Chapter 321 in printed form, only incorporated it by reference, when that chapter was adopted into the City Code of Ordinances. Officer Reineke then reviewed *The Handbook of Iowa All-Terrain Vehicle and Off-Highway Motorcycle Regulations* (*Handbook*), which the defendants contend is a handbook frequently relied upon by police officers when determining whether off road vehicles are operating in compliance with applicable laws. Baldwin denies, for lack of knowledge, the assertion that police officers rely on the *Handbook*, and denies that it addresses the applicable laws of the City. Based upon their reading of the State Code and the information contained in the video provided by the Lillands, Officers Reineke and Hellickson concluded that there had been a violation of what they believed was City Ordinance E–321I.10 (operating on highways). Before issuing a citation, however, Officer Reineke conferred with his supervisor, Captain (now Chief) Brent Shatto, and (then) Chief Eric Milburn. Captain Shatto and

Chief Milburn agreed that they believed that the activity shown on the video amounted to a violation of the local ordinance. The parties now agree, however, that City Ordinance E–321I.10 was not a valid ordinance in effect at the time that Baldwin operated his ATV/UTV on November 10, 2013, because it did not exist at that time, and it still is not part of the City's Code of Ordinances.

Officer Reineke prepared a citation (No. 131818 8) to Greg Baldwin, alleging that "on or about 11/10/2013 at 2:30 PM defendant did unlawfully Operate Motor Vehicle/Boat RED UTV . . . upon a public highway at NORTH 4TH STREET located in the county and state aforesaid and did then and there commit the following offense: Violation ATV OR OFF ROAD UTIL VEH/OPERATION ON HIGHWAYS AND [sic] . . . Local Ord E–321I.10 ICIS E–S/321I.10." Defendants' Appendix at 17. The citation issued on November 11, 2013. Officer Reineke went to the Baldwin residence to serve the citation on November 11, 2013, but no one was home. Because Reineke was scheduled to be off work in the days that followed, he e-filed the citation with the notation: "Request Warrant." On November 12, 2013, David D. Forsyth, Magistrate, Third Judicial District of Iowa, entered an Order directing that a warrant issue. Defendants' Appendix at 18. On November 13, 2013, Officer Hellickson served the warrant on Baldwin, while he was in the parking lot at his grandchild's school, in front of his wife and a large number of people, arrested him, and took him to jail, where he was booked. Baldwin's wife came to the jail and posted bond, and Baldwin was released. Subsequently, Baldwin entered a written plea of not guilty to the charge, and trial was set for May 15, 2014.

The defendants allege that, in the days that followed, City Attorney Christopher Fuhrman discovered that the City had *not* included Iowa Code Ch. 321I when it incorporated Iowa Code Ch. 321 into the Code of Ordinances. They also allege that neither Shatto, Reineke, nor Hellickson knew this; rather, all were operating under the mistaken belief that the adoption and incorporation of Iowa Code Ch. 321 by the City Council included Iowa Code Chs. 321A through 321M. Baldwin disputes these contentions as inconsistent with the meeting that he had with City police officers in 2006 about operation of ATVs in the City; the express incorporation of "chapter 321," not any other chapter of the Iowa Code, into the Code of Ordinances; and the existence of Chapter 9 of the Code of Ordinances. Mr. Fuhrman was granted leave to amend the charge to allege a violation of a different ordinance, City Ordinance 219–2(2). Defendants' Appendix at 28–29. After Baldwin's counsel filed a Motion For Adjudication Of Law Points And To Dismiss, and the City filed its response, the court found "that the cited act is not in violation of the city

code as written and the case is DISMISSED, costs assessed to the City of Estherville." Defendants' Appendix at 30–37.

> Baldwin alleges that, because of his arrest, he suffered mental and emotional harm and anguish, anxiety, fear, degradation, disgrace, uncertainty, apprehensiveness, restlessness, dismay, tension, and unease. He contends that his wife confirmed the effect on him in her deposition. The defendants deny that Baldwin has produced any evidence to support these claims of harm.

*Baldwin v. Estherville*, 218 F. Supp. 3d 987, 992–93 (N.D. Iowa 2016) (omissions in original) (footnote omitted).

The Estherville City Code incorporated Iowa Code chapter 321 via ordinance E-321.1, which stated,

> All sections of the state statutory law, rules of the road, Chapter 321 of the Code of Iowa the offense of which constitutes a simple misdemeanor, are hereby adopted and incorporated by this reference the same as if set forth in full herein into the Code of Ordinances of the City of Estherville, Iowa, and the violation of such applicable state statutory laws of the road shall be a violation of this chapter if the offense occurs within the territorial city limits of the City of Estherville.

Estherville, Iowa, Code of Ordinances, tit. II, div. 1, ch. 7, § E-321.1

Iowa Code section 321.234A covers operation of ATVs and provides,

> All-terrain vehicles shall not be operated on a highway unless one or more of the following conditions apply:
>
> . . . .
>
> f. The all-terrain vehicle is operated on a county roadway in accordance with section 321I.10, subsection 2, or a city street in accordance with section 321I.10, subsection 3.

Iowa Code § 321.234A(1)(*f*) (2013).

Iowa Code section 321I.10 also covers ATVs and provides,

> 1. A person shall not operate an all-terrain vehicle or off-road utility vehicle upon roadways or highways except as provided in section 321.234A and this section.
>
> 2. A registered all-terrain vehicle or off-road utility vehicle may be operated on the roadways of that portion of

county highways designated by the county board of supervisors for such use during a specified period. The county board of supervisors shall evaluate the traffic conditions on all county highways and designate roadways on which all-terrain vehicles or off-road utility vehicles may be operated for the specified period without unduly interfering with or constituting an undue hazard to conventional motor vehicle traffic. In designating such roadways, the board may authorize all-terrain vehicles and off-road utility vehicles to stop at service stations or convenience stores along a designated roadway.

3. Cities may designate streets under the jurisdiction of cities within their respective corporate limits which may be used for the operation of registered all-terrain vehicles or registered off-road utility vehicles. In designating such streets, the city may authorize all-terrain vehicles and off-road utility vehicles to stop at service stations or convenience stores along a designated street.

*Id.* § 321I.10.

The parties now agree that Iowa Code section 321.234A had been incorporated into the Estherville ordinances by ordinance E-321.1, but section 321I.10 had not been so incorporated.

As noted above, City Attorney Fuhrman later amended the charge against Baldwin to allege a violation of a different, free-standing city ordinance, 219.2(2). This ordinance reads,

ATV/UTVs may be operated upon the streets of the City of Estherville, Iowa, except as prohibited in Subsection 1 of this section, by persons possessing a valid Iowa Driver's License.

1. Prohibited Streets. ATV/UTVs shall not be operated upon any city street which is a primary road extension through the city, to wit: Iowa Highway No. 4 and Iowa Highway No. 9. However, ATV/UTVs may cross such primary road extensions.

2. Parks and Other Public Lands. ATV/UTVs shall not be operated off-road in city parks, playgrounds, or upon any publicly-owned property.

3. Private Property. ATV/UTVs may only be operated upon private property with express consent of the owner

thereof or while engaged in snow removal, landscaping, or other maintenance activities.

4. Sidewalk or Parking. No ATV/UTV shall be operated upon sidewalks unless engaged in snow removal or maintenance activities (except along the south sidewalk from South First Street to West South First Street) nor shall they be operated upon that portion of the street located between the curb line and sidewalk or property line commonly referred to as the "parking" except for purposes of snow removal, maintenance, or landscaping activities.

Estherville, Iowa, Code of Ordinances, tit. II, div. 1, ch. 9, 219.2(2). Regardless, as noted above, the district court dismissed the criminal complaint on the ground that Baldwin's conduct was "not in violation of the city code as written."

On November 4, 2015, Baldwin filed a civil suit in the Iowa District Court for Emmet County against the City and Officers Matt and Hellickson, individually and in their official capacities as officers of the Estherville Police Department. In addition to a common-law false arrest claim, Baldwin also alleged violations of his rights under article I, sections 1 and 8 of the Iowa Constitution and his rights under the Fourth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983. Baldwin sought money damages as relief.

On November 20, the defendants removed the case to the United States District Court for the Northern District of Iowa on the basis of federal question jurisdiction pursuant to 28 U.S.C. § 1331. The defendants subsequently filed an answer to Baldwin's claims, denying liability and asserting immunity from suit as an affirmative defense. Trial was set for April 17, 2017.

On July 19, 2016, the defendants moved for partial summary judgment on the federal constitutional claim and the common law false arrest claim, and Baldwin responded with his own motion for partial

summary judgment on August 11. On November 18, the federal district court granted the defendants' motion as to Baldwin's § 1983 claim on two bases: that the officers did not lack probable cause for Baldwin's arrest and that they were entitled to qualified immunity.[1] The court also granted summary judgment to the defendants on the common-law false arrest claim. The court stayed any ruling on the Iowa constitutional claims until this court issued its opinion in *Godfrey v. State*, 898 N.W.2d 844 (Iowa 2017).

---

[1]The district court reasoned in part as follows:

> Baldwin argues that Ordinance 219–2, which was actually part of the City's Code of Ordinances, plainly establishes the *lack* of probable cause for his arrest. I believe that the opposite is true. While Ordinance 219–2 does provide that "ATV/UTVs may be operated upon the streets of the City," it also provides "ATV/UTVs shall not be operated off-road in city parks, playgrounds, or upon any publicly-owned property." The officers knew from the video that they reviewed that Baldwin had operated his ATV in the ditch of a City street and that ditch was publicly-owned property. Indeed, the amended charge against Baldwin, after the City Attorney discovered that Ordinance E321I.10 did not exist, was an alleged violation of Ordinance 219–2(2) for driving on "publicly-owned property," because the video showed Baldwin driving his ATV in the ditch of a City street, which was, at least arguably, publicly-owned property.

> The Iowa District Court ultimately dismissed the amended charge against Baldwin, but only after making two key constructions of pertinent Ordinances. First, the Iowa District Court construed the plain meaning of "street" in City Ordinances to include the "ditch." This conclusion was based on the definition of "street" in City Ordinance 110–102(23) as "mean[ing] and includ[ing] any public way, highway, street, avenue, boulevard, parkway, or other public thoroughfare . . . and unless otherwise indicated in the text, shall include the entire width between the property lines." The Iowa District Court also construed "publicly-owned property" in Ordinance 219–2(2), to the extent that it conflicted with Ordinance 110–102(23), as not including the "ditch" of a City street. . . . The Iowa District Court's after-the-fact constructions do not establish that a prudent person could not have believed, at the time of Baldwin's alleged offense, that he had committed a violation of Ordinance 219–2(2). . . . The officers had probable cause to arrest Baldwin for a violation of Ordinance 219–2(2).

*Baldwin*, 218 F. Supp. 3d at 1000–01 (alterations in original) (first omission in original) (citations omitted).

On October 4, 2017, after we had issued our *Godfrey* decision, the district court certified this question of law to us: "Can a defendant raise a defense of qualified immunity to an individual's claim for damages for violation of article I, § 1 and § 8 of the Iowa Constitution?"

## II. Standard of Review and Criteria for Answering a Certified Question.

Iowa Code section 684A.1 provides,

> The supreme court may answer questions of law certified to it by the supreme court of the United States, a court of appeals of the United States, a United States district court or the highest appellate court or the intermediate appellate court of another state, when requested by the certifying court, if there are involved in a proceeding before it questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the appellate courts of this state.

Iowa Code § 684A.1 (2017).

Accordingly, we have said,

> It is within our discretion to answer certified questions from a United States district court. We may answer a question certified to us when (1) a proper court certified the question, (2) the question involves a matter of Iowa law, (3) the question "may be determinative of the cause . . . pending in the certifying court," and (4) it appears to the certifying court that there is no controlling Iowa precedent.

*Roth v. Evangelical Lutheran Good Samaritan Soc'y*, 886 N.W.2d 601, 605 (Iowa 2016) (omission in original) (quoting *Estate of Corrado*, 838 N.W.2d at 643).

We conclude that these four criteria have been met here and we should answer the certified question. To do so, we will first briefly review our *Godfrey* decision and the status of governmental immunity in Iowa. We will then examine how other jurisdictions that allow constitutional tort

damages claims have treated the question of qualified immunity. Finally, we will consider relevant Iowa precedent and answer the certified question.

### III. *Godfrey v. State.*

Last year, in *Godfrey*, we held that the State of Iowa and state officials acting in their official capacities could be sued directly for violating article I, section 6 (the Iowa equal protection clause) and article I, section 9 (the Iowa due process clause), where state law does not provide an adequate compensatory damage remedy. *See* 898 N.W.2d at 846–47 (majority opinion); *id.* at 880–81 (Cady, C.J., concurring in part and dissenting in part). We concluded that with respect to discrimination based on sexual orientation, the Iowa Civil Rights Act provided an adequate remedy and thus no claim was available under article I, section 6. *Id.* at 881. We did not reach the same conclusion with respect to the due process violations alleged in the petition. *Id.* at 880–81

We expressly deferred consideration of whether qualified immunity applied to these constitutional tort claims. *Id.* at 879. That is the issue we are now asked to address.

### IV. Governmental Immunity in Iowa.

Tort claims against the government in Iowa are governed by chapter 669, for state tort claims, and chapter 670, for municipal tort claims. These chapters apply both to claims against the governmental entity itself and to claims against governmental employees acting in their official capacity.

Each chapter exempts certain claims from liability. These exemptions include the discretionary function exception. Iowa Code § 669.14(1); *id.* § 670.4(1)(*c*). The discretionary function exception in the state tort claims act exception applies to

> [a]ny claim based upon an act or omission of an employee of the state, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion be abused.

*Id.* § 669.14(1). The exception in the municipal tort claims act is worded similarly and applies to

> [a]ny claim based upon an act or omission of an officer or employee of the municipality, exercising due care, in the execution of a statute, ordinance, or regulation whether the statute, ordinance or regulation is valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the municipality or an officer or employee of the municipality, whether or not the discretion is abused.

*Id.* § 670.4(1)(*c*).

In addition to this exemption, there are similar exemptions in both acts for tax claims, claims covered by workers' compensation, claims for negligent design or specification or failure to upgrade roads or public improvements, and punitive damages. *See id.* §§ 669.4(2), .14(2), (5), (8), (9); *id.* § 670.4(1)(*a*), (*b*), (*e*), (*g*), (*h*). Still other exemptions can be found in both chapters.

### V. Review of Other Jurisdictions.

As we noted in *Godfrey*, "The states that have considered the issue are nearly equally divided in whether to recognize implied constitutional actions for damages or whether to decline to recognize such actions." 898 N.W.2d at 856–57 (footnotes omitted). We cited fourteen jurisdictions as recognizing direct damage actions under their state constitutions: California, Connecticut, Illinois, Louisiana, Maryland, Massachusetts, Michigan, Mississippi, Montana, New Jersey, New York, North Carolina, Texas, and Wisconsin. *See id.* at 856 n.2.

We will now review these jurisdictions to determine what immunities, if any, they allow for constitutional tort claims. Our conclusion is that most of these jurisdictions either recognize a federal-type immunity, such as the district court applied to the federal constitutional claims here, or subject constitutional claims to the defenses otherwise available under the state's tort claims act (or similar statute).

**A. States That Recognize *Harlow v. Fitzgerald* Immunity.** Under federal law, officials are entitled to qualified immunity from constitutional claims. That is, they cannot be sued when "their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982). This immunity applies both to claims based on 42 U.S.C. § 1983 and to *Bivens* actions derived directly from the United States Constitution. *See, e.g.*, *Wood v. Moss*, ___ U.S. ___, ___, 134 S. Ct. 2056, 2066–67 (2014); *Harlow*, 457 U.S. at 818, 102 S. Ct. at 2738 & n.30.

Two states that allow direct claims under their own state constitutions—Connecticut and Louisiana—also provide *Harlow*-type immunity.

In *Binette v. Sabo*, the Connecticut Supreme Court recognized a damages cause of action for a violation of the state constitution. 710 A.2d 688, 700–01 (Conn. 1998). The individual defendants in that case had allegedly entered the plaintiffs' home without permission or a warrant. *Id.* at 689. However, the court made an important distinction between the conduct of the government officials in that case—which it characterized as "egregious"—and conduct that was undertaken "reasonably and in good faith." *See id.* at 701 n.23. In the latter circumstance, the court

anticipated that the individual defendants would be shielded from liability. *Id.*

Later, in *Fleming v. City of Bridgeport*, the Connecticut Supreme Court found that a *Harlow*-style qualified immunity was available to municipal officers for damages actions following illegal searches when "it was objectively reasonable for them to believe that their actions would not violate a clearly established right of the plaintiff's under the circumstances." 935 A.2d 126, 144 (Conn. 2007). The plaintiff's suit was then found to be barred by this qualified immunity. *Id.* at 146 ("[W]e cannot say . . . that their approach under the circumstances of this case was so unreasonable as to justify abrogation of their qualified immunity."). *Harlow* was not cited, but the court used a standard similar to that in *Harlow*. *See id.* at 144; *see also Harlow*, 457 U.S. at 818, 102 S. Ct. at 2738.

Louisiana also utilizes the federal qualified immunity standard. In *Moresi v. Department of Wildlife & Fisheries*, the plaintiffs sought recovery under the Louisiana constitutional right to be free from unreasonable searches, seizures, and invasions of privacy. 567 So. 2d 1081, 1091 (La. 1990). The Louisiana Supreme Court "conclude[d] that damages may be obtained by an individual for injuries or loss caused by a violation of Article I, § 5 of the 1974 Louisiana Constitution." *Id.* at 1093. However, the court also determined that the plaintiffs could not recover against the state officers because

> [t]he same factors that compelled the United States Supreme Court to recognize a qualified good faith immunity for state officers under § 1983 require us to recognize a similar immunity for them under any action arising from the state constitution.

*Id.* Qualified immunity would be available "if the defendant show[ed] that the state constitutional right alleged to have been violated was not clearly established." *Id.* at 1094.

Two other jurisdictions we cited in *Godfrey* as allowing direct constitutional damage claims actually authorize such claims through enabling statutes—Massachusetts and New Jersey. Both states have determined that *Harlow* immunity applies to such claims, in addition to defenses expressly written into the statutes themselves.

Thus, in Massachusetts, state constitutional tort claims may be pursued via the state civil rights act. *See Martino v. Hogan*, 643 N.E.2d 53, 59–60 (Mass. App. Ct. 1994). This act appears to be the exclusive avenue for pursuing such claims. *See id.* at 60. And such constitutional claims are subject to two separate limits. First, the Massachusetts Supreme Judicial Court has concluded that the legislature, "in enacting the [state civil rights act], intended to adopt the standard of immunity for public officials developed under [federal law]." *Rodriques v. Furtado*, 575 N.E.2d 1124, 1127 (Mass. 1991). Furthermore, under the express terms of the civil rights act, the plaintiff must prove that a constitutional right has been interfered with "by threats, intimidation, or coercion." *Glovsky v. Roche Bros. Supermarkets, Inc.*, 17 N.E.3d 1026, 1035 (Mass. 2014) (quoting Mass. Gen. Laws ch. 12, § 11H).

New Jersey has also authorized the bringing of state constitutional claims by statute through the New Jersey Civil Rights Act. *See Gormley v. Wood-El*, 93 A.3d 344, 358 (N.J. 2014). Yet as in Massachusetts, a qualified immunity defense is available that "tracks the federal standard" in *Harlow*. *Brown v. State*, 165 A.3d 735, 743 (N.J. 2017). This shields from liability all public officials except those who are "plainly incompetent or those who knowingly violate the law." *Morillo v. Torres*, 117 A.3d 1206,

1215 (N.J. 2015) (quoting *Connor v. Powell*, 744 A.2d 1158, 1164 (N.J. 2000)).[2]

**B. States That Limit Liability to That Authorized by the State Tort Claims Act.** Other states rely on their tort claims acts to demarcate the outer scope of constitutional damages liability. Officials and the state, in other words, receive the immunities contained within the tort claims act and are liable only when the act would render them liable.

Illinois, one jurisdiction we cited in *Godfrey*, follows this approach. In *Newell v. City of Elgin*, the plaintiff sued over a violation of his right against unreasonable searches and seizures set forth in the Illinois Constitution. 340 N.E.2d 344, 346–47 (Ill. App. Ct. 1976). The court determined that the state tort immunity statute governed. *Id.* at 347–48. Under the statute, "a public employee is not liable for his act in the execution or enforcement of any law unless his act 'constitutes willful and wanton negligence.'" *Id.* at 348 (quoting 85 Ill. Rev. Stat. § 2-202 (1973)). Although this elevated standard applied, the court found that the defendant police officers had been guilty of willful and wanton negligence and therefore were not shielded by the statutory immunity. *Id.*; *see also Commerce Bank, N.A. v. Widger*, No. 3–10–0647, 2011 WL 10468212, at *2 (Ill. App. Ct. Nov. 7, 2011) (deciding that a claim under the Illinois

---

[2]Other states not cited in *Godfrey* for recognizing independent constitutional torts also provide *Harlow*-type immunity. For example, Vermont permits constitutional tort claims if the provision is self-executing and the legislature has fashioned no other adequate remedial scheme. *See Shields v. Gerhart*, 658 A.2d 924, 930, 934 (Vt. 1995). "Where the Legislature has provided a remedy, although it may not be as effective for the plaintiff as money damages, [the Vermont courts] will ordinarily defer to the statutory remedy and refuse to supplement it." *Id.* at 934. When a constitutional damages claim is available, the Vermont Supreme Court has recognized *Harlow* qualified immunity as a defense. *See Stevens v. Stearns*, 833 A.2d 835, 842 (Vt. 2003). In *Stevens*, the plaintiffs sued for the alleged violation of their rights against unreasonable searches under the state constitution. *Id.* at 839, 842. Without deciding whether a cause of action existed, the Vermont Supreme Court found it was barred by qualified immunity. *Id.* at 842.

Constitution's search and seizure clause, even if available, was subject to the terms of the State Lawsuit Immunity Act).

So too Maryland. In *Lee v. Cline*, the Maryland Court of Appeals discussed the interplay between constitutional torts and the immunity provided by the state tort claims act. 863 A.2d 297, 303–10 (Md. 2004). In that case, the plaintiff brought suit alleging a violation of his rights under the Maryland Declaration of Rights after he was unlawfully detained in his car allegedly because of his race and the kind of car he was driving. *Id.* at 301. The court surveyed its prior cases as supporting the position that "constitutional torts are covered by the Maryland Tort Claims Act, thereby granting state personnel qualified immunity for such torts." *Id.* at 304–05.

In Maryland, the state tort claims act also limits the *state's* liability for a constitutional tort. *See Cooper v. Rodriguez*, 118 A.3d 829, 844–45 (Md. 2015). Under that act, the state is immune from liability for constitutional claims if the official's actions stem from malice or gross negligence. *Id.* at 854; *see also Brooks v. Jenkins*, 104 A.3d 899, 908 (Md. Ct. Spec. App. 2014) ("If the employee is found . . . to have acted *with* malice or gross negligence, even though in the course of his employment, the State does not assume liability for his conduct."). Furthermore, the state's liability cannot exceed $200,000 per claimant per incident. *See Cooper*, 118 A.3d at 845.

Claims against local governments are also limited. In *Clea v. Mayor of Baltimore*, the Maryland Court of Appeals originally said that "a public official who violates a plaintiff's rights under the Maryland Constitution is entitled to no immunity." 541 A.2d 1303, 1312 (Md. 1988). But in a later case also involving the Baltimore police department, which arose after Maryland passed its local government tort claims act, the same court

indicated that claims against local officials and local governmental entities are subject to the terms of that act, including a cap on damages per individual claim. *Houghton v. Forrest*, 989 A.2d 223, 229–32 & n.5 (Md. 2010); *see also D'Aoust v. Diamond*, 36 A.3d 941, 962 (Md. 2012) (stating that *Clea* has been "super[s]eded by statute"). In short, even as to claims based on the Maryland Declaration of Rights, "Maryland public officials may . . . claim immunity for their official acts on statutory grounds." *Houghton*, 989 A.2d at 229.

Based on *Clea*, Maryland is sometimes cited as a state that refuses to extend common law immunities to constitutional tort claims. *See, e.g.*, Gary S. Gildin, *Redressing Deprivations of Rights Secured by State Constitutions Outside the Shadow of the Supreme Court's Constitutional Remedies Jurisprudence*, 115 Penn St. L. Rev. 877, 903–04 (2011). But this is only part of the story because Maryland's courts have given effect to statutory immunities.

Likewise Mississippi. In *City of Jackson v. Sutton*, the Mississippi Supreme Court found that the plaintiff's constitutional damage claims were barred by the immunity provisions of the Mississippi tort claims act, which contained the exclusive avenue for relief. 797 So. 2d 977, 980–81 (Miss. 2001). Only declaratory actions and not damage claims could be brought outside the act. *Id.* at 980.

In addition, as already noted, it appears that constitutional damage actions in Massachusetts and New Jersey are subject to the limits in the relevant statute—although in those two states it is the civil rights act rather than the tort claims act.

New York also subjects constitutional tort claims to the statutory framework applicable to other tort claims against the state. In *Brown v. State*, the New York Court of Appeals held "that a cause of action to recover

damages may be asserted against the State for violation of the Equal Protection and Search and Seizure Clauses of the State Constitution." 674 N.E.2d 1129, 1138–39 (N.Y. 1996). The claim arose from a five-day "street sweep" involving police stops of all nonwhite males in the city after an elderly white woman reported that a black male attacked her. *Id.* at 1131–32. The claimants asked the court to recognize constitutional tort claims for money damages under the New York Constitution. *Id.* at 1133.

The court acknowledged that "if we are to recognize a damage remedy it must be implied from the Constitution itself." *Id.* at 1137. The court held that "[a] civil damage remedy cannot be implied for a violation of the State constitutional provision unless the provision is self-executing." *Id.* The court concluded that the search and seizure and equal protection clauses of the state constitution were self-executing but acknowledged that a claim for damages *also* required a determination of "whether the remedy of damages for the invasion of . . . rights [established by the self-executing provisions] will be recognized." *Id.* at 1137–38.

The court noted that injunctive or declaratory relief would not help the claimants, nor would exclusion, because the claimants were not charged with a crime. *Id.* at 1141. Therefore, damages were a necessary deterrent for the State's misconduct. *Id.* The court concluded, "[b]y recognizing a narrow remedy for violations of [the state equal protection and search and seizure clauses], we provide appropriate protection against official misconduct at the State level." *Id.*

Notably, New York has waived its sovereign immunity for damages actions against the State. *Id.*; *id.* at 1146 (Bellacosa, J., dissenting) ("The state hereby waives its immunity from liability and action and hereby assumes liability and consents to have the same determined in accordance with the same rules of law as applied to actions in the supreme court

against individuals or corporations." (Emphasis omitted.) (quoting N.Y. Ct. Cl. Act. § 8 (McKinney))). The majority in *Brown* concluded that this waiver removed the defense of sovereign immunity for tort actions, including constitutional torts. *Id.* at 1134–36 (majority opinion). The dissent disagreed that the waiver should be applied in constitutional tort cases. *See id.* at 1147–48 (Bellacosa, J., dissenting).

However, the majority pointed out that many of the legal defenses identified by the dissent *can* be raised by the state "to avoid paying damages for some tortious conduct because, as a matter of policy, the courts have foreclosed liability." *Id.* at 1141 (majority opinion). These defenses include legislative or judicial immunity, immunity for "quasi-judicial or discretionary actions," the "special duty rule" (under which "a plaintiff cannot recover against a municipality for failure to supply police protection or similar services absent a special relationship between the plaintiff and the police or municipality"), and immunity from punitive damages. *Id.*

No New York decisions after *Brown* have considered whether a defendant can assert the defense of qualified immunity. Instead, the courts generally turn down constitutional tort claims because other remedies are available. In a 2001 case, the New York Court of Appeals rejected a constitutional tort claim arising out of an unlawful search, reasoning as follows:

> Moreover, plaintiff fails to demonstrate how money damages are appropriate to ensure full realization of her asserted constitutional rights. Even after years of discovery, plaintiff has not distinguished her case from that of any criminal defendant who has been granted suppression, or reversal of a conviction, based on technical error at the trial level. Plaintiff has shown no grounds that would entitle her to a damage remedy in addition to the substantial benefit she already has received from dismissal of the indictment and release from incarceration.

*Martinez v. City of Schenectady*, 761 N.E.2d 560, 564 (N.Y. 2001); *see, e.g.,* *Shelton v. N.Y. State Liquor Auth.*, 878 N.Y.S.2d 212, 218 (App. Div. 2009) ("Although, in limited situations, a private cause of action to recover monetary damages for state constitutional violations can arise, no such claim will lie where the claimant has an adequate remedy in an alternate forum." (Citations omitted.)).

**C. States That Impose a Higher Burden on Bringing a Constitutional Tort.** In two states referenced in *Godfrey*, i.e., Michigan and Wisconsin, courts have determined that constitutional tort damage claims are available but have subjected such claims to a more demanding legal standard. In Michigan, the violation must have resulted from a state custom or policy to hold the state liable. In Wisconsin, the court required an intentional violation of the state constitution.

Constitutional torts in Michigan have their genesis in *Smith v. Department of Public Health*, 410 N.W.2d 749 (Mich. 1987). There, one plaintiff brought an action against state and public officials for an alleged violation of the state and federal constitutions, and another plaintiff sued the director of state police for alleged violations of his civil rights. *Id.* at 753–54, 767. Among other holdings, the court explicitly noted two things: 1) "Where it is alleged that the state, by virtue of custom or policy, has violated a right conferred by the Michigan Constitution, governmental immunity is not available in a state court action," and 2) "A claim for damages against the state arising from violation by the state of the Michigan Constitution may be recognized in appropriate cases." *Id.* at 751. Although one of the plaintiff–appellants was found not to have preserved the issue for review, the court remanded the other's case for a determination of whether a violation of the constitutional right had been

alleged and had occurred and whether a damage remedy would be available. *Id.*

Subsequent cases, however, have limited the reach of *Smith*. *See, e.g.*, *Lewis v. State*, 629 N.W.2d 868, 868, 872 (Mich. 2001) (rejecting a private cause of action under the equal protection clause of the Michigan Constitution "because the plain language of this constitutional provision leaves its implementation to the Legislature"). In *Carlton v. Department of Corrections*, the court of appeals emphasized that for the state to be liable for a constitutional tort, a state "custom or policy" must have mandated the official or employee's actions. *See* 546 N.W.2d 671, 678 (Mich. Ct. App. 1996). In *Jones v. Powell*, the supreme court narrowed its holding in *Smith* considerably when it held that the "decision in *Smith* provides no support for inferring a damage remedy for a violation of the Michigan Constitution in an action against a municipality or an individual government employee." 612 N.W.2d 423, 426 (Mich. 2000) (per curiam).

Recently in *Mays v. Snyder,* a case arising out of the lead contamination of the water supply of Flint, Michigan, the court found the allegations of plaintiffs' complaint sufficient to allege a statewide governmental policy and, thus, sufficient to state a claim for damages under the due process clause of the Michigan Constitution. ___ N.W.2d ___, ___, 2018 WL 559726, at *2, 19–22 (Mich. Ct. App. Jan. 25, 2018).

In Wisconsin, where the court of appeals has indicated that constitutional torts are permissible under the Wisconsin Constitution, the plaintiff must meet a high burden to recover. *See Old Tuckaway Assocs. Ltd. P'ship v. City of Greenfield*, 509 N.W.2d 323, 328–29 & n.4 (Wis. Ct. App. 1993). In *Old Tuckaway*, the Wisconsin Court of Appeals found that the trial court "did not err in allowing plaintiffs to pursue a direct damage action based on an intentional denial of due process under the state

constitution." *Id.* at 328 n.4. However, the court ultimately concluded that the plaintiff did not meet the burden of showing the intentional denial of due process and therefore did not address whether such a claim might be barred by statutory immunities. *Id.* at 330 n.5. Thus, not only did the court require an intentional tort, but the question of whether immunities—including the doctrine of qualified immunity—might bar constitutional tort claims against individual governmental defendants remains open.

**D. States That Do Not Allow a Direct Constitutional Tort.** Two states we cited in *Godfrey* for recognizing direct damage claims under state constitutions—California and Texas—no longer appear to do so.

In *Godfrey*, we referenced two California cases that date from 1979 and 1982 respectively. 898 N.W.2d at 856 n.2 (citing *Gay Law Students Ass'n v. Pac. Tel. & Tel. Co.*, 595 P.2d 592, 602 (Cal. 1979); *Laguna Publ'g Co. v. Golden Rain Found. of Laguna Hills*, 182 Cal. Rptr. 813, 835 (Ct. App. 1982)). But currently in California, there is no constitutional provision under which a direct claim for damages is clearly available. The California Supreme Court and other California appellate courts have found that freestanding damages actions may not be brought for violations of the state constitutional rights to free speech, due process, equal protection, or the right to petition the government. *See Degrassi v. Cook*, 58 P.3d 360, 367 (Cal. 2002) (freedom of speech); *Katzberg v. Regents of Univ. of Cal.*, 58 P.3d 339, 358 (Cal. 2002) (due process); *MHC Fin. Ltd. P'ship Two v. City of Santee*, 107 Cal. Rptr. 3d 87, 98–99 (Ct. App. 2010) (right to petition); *Carlsbad Aquafarm, Inc. v. State Dep't of Health Servs.*, 100 Cal. Rptr. 2d 87, 92 (Ct. App. 2000) (due process); *Gates v. Super. Ct.*, 38 Cal. Rptr. 2d 489, 512, 517 (Ct. App. 1995) (equal protection).

In *Hernandez v. Hillsides, Inc.*, the California Supreme Court said it was "an open question whether the state constitutional privacy provision,

which is otherwise self-executing and serves as the basis for injunctive relief, can also provide direct and sole support for a damages claim." 211 P.3d 1063, 1072 (Cal. 2009). Iowa has no comparable provision.

In *Godfrey*, we also cited *Jones v. Memorial Hospital System*, a Texas intermediate appellate decision. *See* 898 N.W.2d at 857 n.2 (citing *Jones*, 746 S.W.2d 891, 893–94 (Tex. App. 1988)). But subsequent to *Jones*, the Texas Supreme Court has determined there is no right to sue for damages under the Texas Constitution. *See City of Beaumont v. Bouillion*, 896 S.W.2d 143, 149 (Tex. 1995) ("[T]here is no implied private right of action for damages under the Texas Constitution when an individual alleges the violation of speech and assembly rights."). In *City of Elsa v. M.A.L.*, three former police officers brought a constitutional tort action against the city when it allegedly disclosed to the media they had left the force following positive drug tests. 226 S.W.3d 390, 391 (Tex. 2007) (per curiam). The officers asserted violations of their state constitutional right to privacy and sought monetary damages and equitable and injunctive relief. *Id.* The Texas Supreme Court reaffirmed that governmental entities could not be sued in damages for violating the Texas Constitution. *Id.* at 392.[3]

---

[3]Two other jurisdictions that have not recognized direct constitutional damage claims are Florida and Minnesota.

Florida intermediate appellate courts have repeatedly found that monetary damages are unavailable for violations of state constitutional rights. *See Bradsheer v. Fla. Dep't of Highway Safety & Motor Vehicles*, 20 So. 3d 915, 921 (Fla. Dist. Ct. App. 2009); *Fernez v. Calabrese*, 760 So. 2d 1144, 1146 (Fla. Dist. Ct. App. 2000); *Garcia v. Reyes*, 697 So. 2d 549, 549–50 (Fla. Dist. Ct. App. 1997). The state supreme court has never directly addressed this issue. *See Resha v. Tucker*, 670 So. 2d 56, 57 (Fla. 1996) (finding that a constitutional violation by a state official acting outside the scope of her official duties did not give rise to an action for money damages under the specific facts of the case). One intermediate appellate court has said that even if such a cause of action against state officials existed, it would be barred by statutory immunity. *See Garcia*, 697 So. 2d at 550 ("We further find that if [a cause of action for money damages against the state, its agencies or employees acting in their official capacities for police misconduct arising directly under the due process clause] existed, a lawsuit against the [city] and its police officer . . . would be barred by sovereign immunity.").

**E. States Where Immunity Is an Open Issue.** In two jurisdictions that permit direct constitutional claims for damages, Montana and North Carolina, immunity appears to be an open issue. Both jurisdictions allow constitutional damage claims only when there is no analogous statutory or common-law cause of action.

In *Dorwart v. Caraway*, 58 P.3d 128, 131, 137 (Mont. 2002), the Montana Supreme Court found that the plaintiff could bring a direct damages action for violation of the due process, search and seizure, and privacy clauses of the Montana Constitution. It declined to adopt a *Harlow* form of qualified immunity analogous to that available for violations of the United States Constitution. *Id.* at 139–40. However, it remains an open question whether statutory immunities generally available to public defendants can be used in the defense of constitutional tort actions. *See Nickel v. Faycosh*, No. DA 09–0032, 2009 WL 3319990, at \*3–4 (Mont. Oct. 14, 2009) (declining to decide the issue). Furthermore, if adequate

---

Twenty-four years ago, in a case involving a tax that violated the *Federal* Constitution, the Florida Supreme Court said, "Sovereign immunity does not exempt the State from a challenge based on violation of the federal or state constitutions, because any other rule self-evidently would make constitutional law subservient to the State's will." *Dep't of Revenue v. Kuhnlein*, 646 So. 2d 717, 721, 724 (Fla. 1994). But *Kuhnlein* has not been used for that proposition by a Florida court since it was written. As noted, no Florida appellate court has actually recognized a direct damages claim under the Florida Constitution.

To date, Minnesota similarly has not recognized an action for damages for alleged violations of the state constitution. *See Laliberte v. State*, No. A13–0907, 2014 WL 1407808, at \*2 (Minn. Ct. App. Apr. 14, 2014); *Davis v. Hennepin County*, No. A11–1083, 2012 WL 896409, at \*2 (Minn. Ct. App. Mar. 19, 2012); *see also Dean v. City of Winona*, 868 N.W.2d 1, 9 (Minn. 2015) (Lillehaug, J., concurring) (describing the appellants' rejected theory of recovery of nominal damages under the remedies clause for a violation of the state constitution as "novel").

Thirty years ago, in *Elwood v. Rice County*, the Minnesota Supreme Court held that *Harlow*-style qualified immunity did not apply to state common law claims but that Minnesota's own official immunity doctrine applied. 423 N.W.2d 671, 677 (Minn. 1988). This doctrine requires proof of "a willful or malicious wrong." *Id.* (quoting *Susla v. State*, 247 N.W.2d 907, 912 (Minn. 1976). Regardless, Minnesota has not recognized stand-alone constitutional damage claims.

remedies exist under statutory or common law, the plaintiff is not entitled to bring a constitutional tort claim. *See Sunburst Sch. Dist. No. 2 v. Texaco, Inc.*, 165 P.3d 1079, 1093 (Mont. 2007) (finding that the recent adoption of Restatement (Second) of Torts § 929 to allow for the recovery of restoration damages meant that the district court "erred in instructing the jury on the constitutional tort theory where . . . adequate remedies exist under statutory or common law"); *see also Salminen v. Morrison & Frampton, PLLP*, 339 P.3d 602, 611 (Mont. 2014) ("Since the Salminens have a basis in law for a claim to redress this allegation, they need not proceed under the Constitution.").

North Carolina also falls into this wait-and-see category. In *Corum v. University of North Carolina*, the North Carolina Supreme Court decided that a plaintiff may recover damages for a violation of a state constitutional right when there is no common law or statutory remedy. 413 S.E.2d 276, 289 (N.C. 1992). That case involved alleged violations of the plaintiff's right to free speech, although other cases have involved other constitutional rights. *See id.*; *Sale v. State Highway & Pub. Works Comm'n*, 89 S.E.2d 290, 297 (N.C. 1955) (recognizing a cause of action under the state due process clause); *Adams v. City of Raleigh*, 782 S.E.2d 108, 114–15 (N.C. Ct. App. 2016) (finding that common-law false arrest provided a sufficiently analogous remedy to preclude a constitutional claim, even if such a false arrest claim might not succeed in the particular case); *Davis v. Town of S. Pines*, 449 S.E.2d 240, 248 (N.C. Ct. App. 1994) (finding plaintiff's "constitutional right not to be unlawfully imprisoned and deprived of her liberty [was] adequately protected by her common law claim of false imprisonment," and she could thus not bring a constitutional tort claim). The *Corum* court noted that

> when public officials invade or threaten to invade the personal or property rights of a citizen in disregard of law, they are not relieved from responsibility by the doctrine of sovereign immunity even though they act or assume to act under the authority and pursuant to the directions of the State.

413 S.E.2d at 292.  However, although officials could be sued in their official capacities, they could not be sued in their individual capacities.  *Id.* at 292–93.

Later, that court addressed this issue again in *Craig ex rel. Craig v. New Hanover County Board of Education* when a plaintiff filed a damages action against the board of education and the principal of his middle school in her individual and official capacities after the plaintiff was sexually assaulted.  678 S.E.2d 351, 352 (N.C. 2009).  The court's holding indicated that the defense of sovereign immunity cannot be applied to prevent a plaintiff from redressing a constitutional wrong.  *Id.* at 356–57.  However, the court also limited its ruling by stating,

> This holding does not predetermine the likelihood that plaintiff will win other pretrial motions, defeat affirmative defenses, or ultimately succeed on the merits of his case.  Rather, it simply ensures that an adequate remedy must provide the possibility of relief under the circumstances.

*Id.* at 355.  Thus, other defenses may not necessarily be precluded, even if they would leave the plaintiff without a remedy.  As one commentator queried,

> Does being time-barred by a statute of repose preclude the possibility of relief?  What about qualified immunity?  In *Craig,* a direct constitutional claim was allowed because Craig's claim was precluded by governmental immunity, "regardless of his ability to prove his case."  What was left unclear, however, is whether any other procedural bar or well-pled defense would be treated differently.

Matthew R. Gauthier, *Kicking and Screaming: Dragging North Carolina's Direct Constitutional Claims into the Twenty-First Century*, 95 N.C. L. Rev.

1735, 1747–48 (2017) [hereafter Gauthier, *Kicking and Screaming*] (footnotes omitted) (quoting *Craig,* 678 S.E.2d at 355).

**VI.  The Proper Approach in Iowa.**

**A.  Strict Liability Would Go Too Far.**  This leads us to Iowa law and the certified question.

To begin with, we are convinced that constitutional tort claims in Iowa should be subject to *some limit.*  As we have already seen, the other states that allow such claims limit liability in some fashion, except for Montana and North Carolina.  Those two states have not decided the issue yet.

Consider also the three Iowa precedents we singled out in *Godfrey* for having recognized constitutional torts.  *See* 898 N.W.2d at 862–63.  Each involved bad faith conduct, and one of those cases made it clear that malice and lack of probable cause were elements of the claim.

*McClurg v. Brenton* arose when a search party forced their way late at night into a house suspected of harboring stolen chickens, although the party lacked a warrant and although nighttime searches were illegal at the time in the absence of special authority.  123 Iowa 368, 369–70, 372, 98 N.W.  881, 881–82 (1904).  We further described the exceptional circumstances of the case as follows:

> There is testimony, also, that the search was conducted, by some of the party, at least, in a loud and boisterous manner, and with little regard for the sensibilities of the plaintiff and his family.  One of the searchers candidly admits that he was a "little enthused," and did not pay much attention to the details; and it is said by one witness that another member of the party became somewhat confused as to the real object of the search, and demanded to know whether there was "any beer in the cellar."  The discouraging answer that there "was no cellar" seems not to have been fully credited, for it is further testified that the knot holes in the floor were carefully probed with a pocket rule, to ascertain the amount of available space thereunder.  Upon such a state of the record, we think it very

> clear that the jury should have been allowed to pass upon the issue of fact presented by the pleadings. If plaintiff's home was invaded in the manner claimed by him, he has suffered a wrong for which the law will afford him substantial remedy.

*Id.* at 371, 98 N.W. at 882.

*Krehbiel v. Henkle* was another case involving egregious misconduct in connection with a search. 142 Iowa 677, 678–79 121 N.W. 378, 379 (1909). There we were explicit that "evidence of malice and want of probable cause for the prosecution must be shown in order to sustain a recovery of damages." *Id.* at 680, 121 N.W. at 380. After invoking article I, section 8 we said, "[A] violation of this right *without reasonable ground therefor* gives the injured party a right of action." *Id.* (emphasis added).[4]

Lastly, in *Girard v. Anderson,* we held that when two private individuals broke into a locked home to forcibly repossess property, the homeowner had a cause of action against them for trespass and conversion. 219 Iowa 142, 144–45, 148, 257 N.W. 400, 400–01, 403 (1934). The case involves private defendants and therefore does not speak to the standards for the recovery of damages against government defendants. *See id.* at 144; 257 N.W. at 400. Even so, the facts presented by the plaintiff involved forcibly breaking and entering. *Id.*

In short, some limits are consistent with the Iowa precedent we invoked in *Godfrey.*

---

[4]In *Godfrey*, we characterized *Krehbiel* as a damages action for violation of article I, section 8, not as a malicious prosecution case. 898 N.W.2d at 862. We quote *Krehbiel* again:

> The right of the citizen to security in person and property against wrongful seizures and searches is one which the law has ever zealously safeguarded and has express recognition in our state Constitution. Const. Iowa, art. 1, § 8. That a violation of this right without reasonable ground therefor gives the injured party a right of action is thoroughly well settled.

142 Iowa at 679–80, 121 N.W. at 379–80. *Krehbiel* went on to note that "[t]he essence of the wrong done to [the plaintiff] was the unreasonable invasion of his home." *Id.* at 681, 121 N.W. at 380.

We further note that at the time our Constitution was adopted, public officials received the benefit of a form of qualified immunity. In *Hetfield v. Towsley,* we rejected a claim against a justice of the peace and constable for wrongly taking away the plaintiff's oxen. 3 Greene 584, 584–85 (Iowa 1852). We explained,

> The justice and constable, in what they did, were in the performance of official duty. Unless they exceeded their jurisdiction, or acted corruptly, or without authority of law, they are not liable. Although the justice might have acted erroneously, still he was not liable as a trespasser. The injured party had his remedy by *certiorari* or appeal. The demurrers admit the official character of the officers, and also that they acted in good faith, as stated by them in their special pleas.

*Id.* at 585. *Hetfield* cannot be explained as a judicial immunity case because the court also exonerated the constable. *See also Howe v. Mason,* 12 Iowa 202, 203–04 (1861) ("Officers required by law to exercise their judgment are not answerable for mistakes in law or mere errors of judgment without any *fraud* or *malice.*"); *Plummer v. Harbut,* 5 Iowa 308, 311–14 (1857) (finding that where the defendants broke and entered the plaintiff's close pursuant to a warrant and took and destroyed the liquors therein, even though the entry was without proper authority the plaintiff could not recover the value of the illegal liquors and could recover only nominal damages for the breaking and entering because the defendants had acted in good faith).

In addition, our conclusion in *Godfrey* that the Iowa Constitution can sustain a damages remedy without prior action by the Iowa legislature does not mean the Iowa *courts* have no role in crafting that remedy. Nor does it mean that traditional tort rules are irrelevant. The Restatement (Second) of Torts section 874A makes both of these points. Restatement (Second) of Torts § 874A (Am. Law Inst. 1979). That particular section

covers "Tort Liability for Violation of Legislative Provision," while including "constitutional provisions" within its scope. *See id.* & cmt. *a.* As we noted in *Godfrey,* section 874A has been cited as support for constitutional damage claims in other jurisdictions. *See* 898 N.W.2d at 858, 860.

Section 874A contemplates that a court implying a constitutional (or statutory) cause of action will "us[e] a suitable existing tort action or a new cause of action analogous to an existing tort action." *See* Restatement (Second) of Torts § 874A. Comment *f* reiterates this point and states that a civil action to effectuate a constitutional provision "will ordinarily be assimilated to the most similar common law tort." *Id.* cmt. *f.* Comment *j* adds that

> [w]hether the tort action provided by the court in furtherance of the policy of a legislative [or constitutional] provision is to be treated as an intentional tort, as negligence or as a form of strict liability, or perhaps as involving all three . . . , depends primarily upon construction of the statute [or constitutional provision] itself.

*Id.* cmt. *j.*

Moreover, strict damages liability for any constitutional wrong would lead to untenable results. On this point, it is worth analyzing a few of the cases where we found state and local officials were entitled to various immunities when claims had been brought against them under the United States Constitution through 42 U.S.C. § 1983. Should all those immunities vanish just because claims are also brought under the Iowa Constitution?

In *Minor v. State,* the plaintiff asserted that two employees of the Iowa Department of Human Services had improperly caused her child to be removed from her care and failed to protect that child once placed in foster care, in violation of her Fourth and Fourteenth Amendment rights.

819 N.W.2d 383, 392 (Iowa 2012). There, we determined that the employees were entitled to qualified immunity. *Id.* at 400–04.

In *Teague v. Mosley,* the plaintiff sued three of the five members of a county board of supervisors, alleging they had violated his constitutional rights by not providing a safe environment at the jail. 552 N.W.2d 646, 647 (Iowa 1996). We adopted a rule of absolute immunity for supervisors acting in a legislative capacity. *Id.* at 649.

In *Dickerson v. Mertz,* the plaintiff sued after having been issued citations for hunting without a valid license and later for "taking deer by auto," and subsequently having been acquitted of both charges. 547 N.W.2d 208, 210–11 (1996). We determined that the defendant officers of the Department of Natural Resources were entitled to qualified immunity from federal constitutional claims because the "plaintiff ha[d] not shown a factual issue concerning the unreasonableness of defendants' actions based on the existing law." *Id.* at 215–16.

We believe the government officials in these cases would be reluctant to fully perform their jobs if they could be found strictly liable for actions that happened to violate someone's constitutional rights. There is a danger of overdeterrence. Search and seizure involves judgment calls. For example, in *In re Pardee*, 872 N.W.2d 384 (Iowa 2015), this court was recently divided on whether a twenty-five-minute investigatory stop of a vehicle was too long. Five members of our court said it was; two said it wasn't. *See id.* at 397 (concluding the stop had been impermissibly prolonged); *id.* at 397–99 (Cady, C.J., dissenting) (concluding the stop had not been improperly prolonged). The line between good police work and overzealous police work can be razor thin. It is certainly fair to exclude the evidence from any ensuing criminal proceeding whenever the line is crossed, even slightly. But if the law enforcement officer also is subject to

a damage action, this could lead him or her to be reluctant to act at all in a gray area.[5]

And there would be no reason for anyone—including judges—to get special treatment. For example, in this particular case, the magistrate who issued the arrest warrant for Baldwin would be subject to a damages suit as well.

It is true we said in *State v. Tonn* that "[a] trespassing officer is liable for all wrong done in an illegal search or seizure." 195 Iowa 94, 106, 191 N.W. 530, 535 (1923), *abrogated by State v. Cline*, 617 N.W.2d 277, 291 (Iowa 2000). But we said this to justify *eliminating* the exclusionary rule

---

[5]Furthermore, many lawful searches and seizures do not result in a criminal prosecution. Thus, when law enforcement chooses to perform a search or seizure, in many cases there will be no "benefit" to the government, only a risk of being subject to a damages action based on after-the-fact second-guessing. This may incentivize law enforcement not to go forward unless there is some protection for good-faith conduct.

An academic has raised some additional points about incentives:

Moreover, the incentives facing government officers are skewed by a cause-of-action problem. An individual hurt by government conduct usually knows exactly whom to blame. The causal connection between the plaintiff's injury and the defendant's conduct is typically clear, and the victim has no trouble stating a cause of action. A person injured by official inaction—by the officer who foregoes an arrest or the school principal who tolerates a troublemaker—often has difficulty identifying any officer responsible for subsequent injury and proving a causal connection. As a result, the risk of being sued for erroneous action is much higher than the risk of being sued for erroneous inaction, though the two may be equally costly. This disparity increases the incentive to protect oneself by doing less.

Even aside from the cause-of-action problem, the incentive structure of government officials encourages inaction. The idea is most plausible for civil servants, who face punishment or loss for demonstrable misconduct but who are rarely able to capture the gains of effective action.

John C. Jeffries Jr., *The Liability Rule for Constitutional Torts*, 99 Va. L. Rev. 207, 244–45 (2013) (footnotes omitted).

It is true that public officials are typically indemnified for damage actions against them. *See* Joanna C. Schwartz, *Police Indemnification*, 89 N.Y.U. L. Rev. 885, 890 (2014); Iowa Code § 669.5(2)(*a*); *id.* § 670.8. But the indemnitor has the ability and the motive to influence the indemnitee's behavior. *See, e.g.,* John Rappaport, *How Private Insurers Regulate Public Police*, 130 Harv. L. Rev. 1539, 1573–95 (2017).

in Iowa. *Id.* at 106–07, 191 N.W. at 535–36. *Tonn* was not perhaps our court's most shining moment. It involved the prosecution of a member of the labor organization known as the International Workers of the World (IWW) who was "engaged in spreading the propaganda of the organization." *Id.* at 106, 191 N.W. at 535. Two justices dissented from the abandonment of the exclusionary rule, one of them also questioning the constitutionality of the law under which the defendant was prosecuted. *Id.* at 116, 120–21, 191 N.W. at 539, 541 (Weaver, J., dissenting). Today, we would probably view the IWW member's conduct as protected speech.

More recently, in *Cline,* we rejected a good-faith exception to the exclusionary rule under article I, section 8, making essentially the opposite point from what we had said in *Tonn*:

> In our early *Tonn* case, we observed that the exclusionary rule was unnecessary to enforce the constitutional right because other remedies were available. Whatever truth there may have been to this statement when it was made, it is not valid today. There is simply no meaningful remedy available to one who has suffered an illegal search other than prohibiting the State from benefiting from its constitutional violation. A civil remedy would probably be unsuccessful because the good faith that prevents exclusion would also preclude an action for damages.

617 N.W.2d at 291. *Cline* is our law today: We have approved a comprehensive exclusionary rule cognizant of limits on damage actions.

Thus, the right to recover damages for a constitutional violation does not need to be congruent with the constitutional violation itself. Such an approach is not consistent with Iowa precedent or Restatement section 874A, and would result in too little play in the joints.[6] Logically, the

---

[6]According to Professor Jeffries,

> some gap between constitutional rights and the damages remedy is a good thing. It is not a problem to be solved, but an asset to be preserved. Eliminating that gap entirely would have a baleful effect on the content and development of constitutional law.

threshold of proof to *stop* an unconstitutional course of conduct ought to be less than the proof required to *recover damages* for it. Indeed, if a right of recovery for a constitutional tort existed whenever a constitutional violation occurred, it stands to reason that such recovery could not be subject to other limits, such as a statute of limitations. *See* Gauthier, *Kicking and Screaming*, 95 N.C. L. Rev. at 1747–48.[7]

**B. Qualified Immunity Based on the Exercise of Due Care Should Be Available for Damage Claims Under Article I, Sections 1 and 8**. If strict liability is not the correct standard, what is? For purposes of article I, sections 1 and 8, we are convinced that qualified immunity should be available to those defendants who plead and prove as an affirmative defense that they exercised all due care to conform to the requirements of the law.

As we have noted, a number of states allow *Harlow* immunity for direct constitutional claims. In those jurisdictions, there cannot be liability unless the defendant violated "clearly established . . . constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S. Ct. at 2738. *Harlow* examines objective

---

Jeffries, 99 Va. L. Rev. at 246. He goes on to explain that limitations on damages facilitate the evolution of constitutional law:

> At each and every stage, from wholesale innovation to minor adjustment, these decisions found unconstitutional acts that previously could have been thought lawful. All these acts had victims, and all the victims had injuries. If awarding damages had been a necessary corollary of finding violations, the potential impact would have been staggering.

*Id.* at 248 (footnote omitted). Simply stated, "[u]nder current law, the prospect of awarding money damages does not constrain the definition of constitutional rights." *Id.*

For example, in Iowa, would it inhibit developments of article I, section 17 jurisprudence if every individual whose sentence was later determined to be unconstitutional could recover constitutional tort damages?

[7]Of course, this does not mean constitutional violations would go unremedied. The issue is whether a direct *damages* remedy would be available.

reasonableness; thus, in some ways it resembles an immunity for officials who act with due care. However, it is centered on, and in our view gives undue weight to, one factor: how clear the underlying constitutional law was. Normally we think of due care or objective good faith as more nuanced and reflecting several considerations. *See, e.g.*, *Hetfield*, 3 Greene at 585. Factual good faith may compensate for a legal error, and factual bad faith may override some lack of clarity in the law.

Other jurisdictions that have opened the doors to direct constitutional damage claims have done so within the framework of their existing tort claims acts. Often, these laws shield defendants who act with due care or even who are guilty of ordinary negligence. *See, e.g.*, *Martin v. Brady*, 802 A.2d 814, 819 (Conn. 2002) (finding the defendants would be liable only if their conduct was "wanton, reckless or malicious"); *Newell*, 340 N.E.2d at 348 ("[A] public employee is not liable for his act in the execution or enforcement of any law unless his act 'constitutes willful and wanton negligence.' " (quoting 85 Ill. Rev. Stat. § 2–202 (1973)).

Iowa's tort claims acts already protect government officials in some instances when they exercise due care. *See, e.g.*, Iowa Code § 669.14(1) (excepting "[a]ny claim based upon an act or omission of an employee of the state, *exercising due care*, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion be abused" (emphasis added)); *id.* § 670.4(1)(*c*) (excepting "[a]ny claim based upon an act or omission of an officer or employee of the municipality, *exercising due care*, in the execution of a statute, ordinance, or regulation whether the statute, ordinance or regulation is valid, or based upon the exercise or performance

or the failure to exercise or perform a discretionary function or duty on the part of the municipality or an officer or employee of the municipality, whether or not the discretion is abused" (emphasis added)). The problem with these acts, though, is that they contain a grab bag of immunities reflecting certain *legislative* priorities. Some of those are unsuitable for *constitutional* torts.

A third set of jurisdictions simply impose higher fault standards as a prerequisite to liability. *See Mays*, ___ N.W.2d at ___, 2018 WL 559726, at *19–22 (requiring a showing of a custom or policy); *Old Tuckaway Assocs.*, 509 N.W.2d at 330 (requiring proof of an intentional denial of due process).

We have decided not to follow any of these lines of authority exactly. We believe instead that qualified immunity should be shaped by the historical Iowa common law as appreciated by our framers and the principles discussed in Restatement (Second) of Torts section 874A.

This means due care as the benchmark. Proof of negligence, i.e., lack of due care, was required for comparable claims at common law at the time of adoption of Iowa's Constitution. *See Hetfield*, 3 Greene at 585; *Howe*, 12 Iowa at 203–04. And it is still the basic tort standard today. *See* Restatement (Second) of Torts § 874A (discussing reliance on analogous tort standards).

Because the question is one of immunity, the burden of proof should be on the defendant. *See Anderson v. State*, 692 N.W.2d 360, 364 (Iowa 2005) (indicating that the party asserting the discretionary function immunity has the burden to prove it). Accordingly, to be entitled to

qualified immunity a defendant must plead and prove as an affirmative defense that she or he exercised all due care to comply with the law.[8]

We find support for our approach in a recent and thoughtful critique of *Harlow*. *See* John C. Jeffries Jr., *The Liability Rule for Constitutional Torts*, 99 Va. L. Rev. 207 (2013). Professor Jeffries notes, "The basic and essential remedy for most constitutional rights is the opportunity to assert them defensively against government coercion." *Id.* at 242. Nevertheless, Professor Jeffries concludes that "damages are appropriate to the vindication of constitutional rights, absent countervailing concerns, of which the most important and obvious would be superseding remedial legislation." *Id.* at 259 (footnotes omitted). "[C]onstitutional tort actions are presumptively appropriate." *Id.*[9]

In the end, Professor Jeffries condemns *Harlow* as "an overly legalistic and therefore overly protective shield," but advocates for a more straightforward "protection for reasonable error." *Id.* at 258–60. "The problem with current law is its implicit equation of reasonable error with the space between decided cases." *Id.* at 260.[10]

---

[8]We have in the past invalidated presumptions rendering one party responsible for another party's illegal conduct unless the first party proves he or she exercised due care. *See Westco Agronomy Co. v. Wollesen*, 909 N.W.2d 212, 222–23 (Iowa 2017); *Hensler v. City of Davenport*, 790 N.W.2d 569, 587–89 (Iowa 2010). That is not the situation here. The issue is what a defendant to a constitutional damages action under article I, sections 1 and 8 must show to obtain qualified immunity for his or her own conduct.

[9]Professor Jeffries's stance here is similar to the one we took in *Godfrey* on the basic issue of whether constitutional torts should be allowed. *Godfrey* generally approved of direct damages actions under the Iowa Constitution but the special concurrence that provided the decisive vote determined that a damages remedy under article I, section 6 for discrimination based on sexual orientation was not needed in light of an existing, adequate remedy within the Iowa Civil Rights Act. *See* 898 N.W.2d at 880–81 (Cady, C.J., specially concurring).

[10]Professor Jeffries acknowledges that "[o]n balance, academic opinion favors [strict liability for constitutional violations]." 99 Va. L. Rev. at 241. On the other hand, as we have discussed, no other state judiciary has opted for strict liability.

We agree. Constitutional torts are torts, not generally strict liability cases. Accordingly, with respect to a damage claim under article I, sections 1 and 8, a government official whose conduct is being challenged will not be subject to damages liability if she or he pleads and proves as an affirmative defense that she or he exercised all due care to conform to the requirements of the law.

We leave open a number of other issues. These include the possibility that constitutional claims other than unlawful search and seizure may have a higher mens rea requirement, such as intent, embedded within the constitutional provision itself. In other words, it may take more than negligence just to violate the Iowa Constitution. They also include the possibility that common law absolute immunities, such as judicial immunity or quasi-judicial immunity, could apply to state constitutional claims. And they include the potential applicability of provisions in chapters 669 and 670 other than sections 669.14 and 670.4. We do not address those issues today.

## VII. Conclusion.

We have provided the answer to the certified question as set forth above. Costs shall be divided equally among the parties. Iowa Code § 684A.5.

**CERTIFIED QUESTION ANSWERED.**

All justices concur except Appel and Hecht, JJ., who dissent.

**APPEL, Justice (dissenting).**

I dissent. The controversy in this case involves an allegation of a specific constitutional violation, namely, whether an allegedly unconstitutional seizure of a person by local law enforcement gives rise to a claim of damages. I would answer the certified question by stating that there is no immunity available to shield the defendants from liability for the alleged harm caused by their constitutional torts arising out of article I, section 1 and article I, section 8 of the Iowa Constitution.

## I. Liability of the City for Money Damages.

There is a preliminary issue in the case. The City of Estherville (the City) is a defendant in this case. The State of Iowa, as an amicus, urges us to consider whether a local government entity may be sued for money damages for constitutional violations. The question of the City's liability for constitutional violations of its employees is a distinctly different question than whether individual officers employed by the City are entitled to some form of qualified immunity for their unconstitutional conduct.

The United States Supreme Court has addressed the question in *Monell v. Department of Social Services*, 436 U.S. 658, 98 S. Ct. 2018 (1978). In *Monell*, the United States Supreme Court held that although local governments are "persons" under 42 U.S.C. § 1983, they cannot be held liable under a respondeat superior theory for the constitutional deprivations arising from the conduct of their employees unless the conduct was as a result of a government custom or practice. *Id.* at 690–91, 98 S. Ct. at 2035–36. The *Monell* Court did not specifically expand on the circumstances where a municipality could be found liable under the statute, but as a matter of practice, when a plaintiff attempts to prove an unwritten policy or municipal inaction, proof of liability under *Monell* is

"exceptionally difficult." John M. Greabe, *Remedial Discretion in Constitutional Adjudication*, 62 Buff. L. Rev. 881, 907 n.142 (2014).

In an important subsequent case, *Owen v. City of Independence*, the United States Supreme Court determined that when a plaintiff successfully demonstrates that a municipality has a custom or policy that violated his or her constitutional rights, the municipality is strictly liable for the violation. 445 U.S. 622, 638, 100 S. Ct. 1398, 1409 (1980). The *Owen* Court noted that "in the hundreds of cases from [the common law] era awarding damages against municipal governments for wrongs committed by them, one searches in vain for much mention of a qualified immunity based on the good faith of municipal officers." *Id.* at 641, 100 S. Ct. at 1410.

The *Owen* Court emphasized that the strict-liability approach to unconstitutional municipal policies and customs has sound policy footing. *Id.* at 650, 100 S. Ct. at 1415.

> How "uniquely amiss" it would be . . . if the government itself—"the social organ to which all in our society look for the promotion of liberty, justice, fair and equal treatment, and the setting of worthy norms and goals for social conduct"—were permitted to disavow liability for the injury it has begotten.

*Id.* at 651, 100 S. Ct. at 1415 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 190, 90 S. Ct. 1590, 1620 (1970) (Brennan, J., concurring in part and dissenting in part)). According to the Court,

> The knowledge that a municipality will be liable for all of its injurious conduct, whether committed in good faith or not, should create an incentive for officials who may harbor doubts about the lawfulness of their intended actions to err on the side of protecting citizens' constitutional rights.

*Id.* at 651–52, 100 S. Ct. at 1416.

The *Owen* Court sharply distinguished between the liability of municipalities and liability of individual officials. *Id.* at 655–56, 100 S. Ct.

at 1418. The Court noted that the justification for qualified immunity for individual officials is based upon the threat of *personal* liability. *Id.* Where liability of municipalities is involved, however, "[t]he inhibiting effect is significantly reduced, if not eliminated . . . [because] the threat of personal liability is removed." *Id.* at 656, 100 S. Ct. at 1418.

There are substantial reasons for following *Owen* but not *Monell* in determining municipalities' potential liability for the constitutional wrongs of their employees. *Monell* does not involve a constitutional issue, but only a statutory issue under federal law. *See* 436 U.S. at 660 & n.1, 98 S. Ct. at 2020 & n.1. Further, the substantive holding in *Monell* has been subject to substantial criticism. *See, e.g.*, David Jacks Achtenberg, *Taking History Seriously: Municipal Liability Under 42 U.S.C. § 1983 and the Debate over Respondeat Superior*, 73 Fordham L. Rev. 2183, 2196 (2005); Michael J. Gerhardt, *The* Monell *Legacy: Balancing Federalism Concerns and Municipal Accountability Under Section 1983*, 62 S. Cal. L. Rev. 539, 540–41 (1989); Myriam E. Gilles, *Breaking the Code of Silence: Rediscovering "Custom" in Section 1983 Municipal Liability*, 80 B.U. L. Rev. 17, 29–31 (2000). As a result, it is not surprising that several state courts have declined to follow the statutory interpretation in *Monell* on the constitutional question of whether a city is liable for the torts of its employees under a respondeat superior theory. *See, e.g., Town of Port Deposit v. Petetit*, 688 A.2d 54, 65 (Md. Ct. Spec. App. 1992) (holding municipality may be liable for constitutional torts under respondeat superior theory); *Washington v. Robertson County*, 29 S.W.3d 466, 475–77 (Tenn. 2000) (same).

However, the parties, in this case, do not directly address the *Monell* issue or the application of *Monell* in *Owen* but concentrate their advocacy on the question of whether individual city employees are entitled to

qualified immunity with respect to damage claims arising from their unconstitutional conduct. Ordinarily, we do not consider issues raised only by amici and not by the parties themselves. *See Press-Citizen Co. v. Univ. of Iowa*, 817 N.W.2d 480, 493 (Iowa 2012); *Mueller v. St. Ansgar State Bank*, 465 N.W.2d 659, 660 (Iowa 1991).

The majority in this case has now judicially created a type of immunity for individual officers. As explained below, I dissent from the majority's approach to individual liability for constitutional wrongs. The majority's approach, however, increases the pressure to reject the limitations in *Monell* and apply the strict-liability approach in *Owen* across the board to claims against municipalities.

Nevertheless, the issue of municipal liability for damages caused by the unconstitutional conduct of its employees was not presented by the parties in this case, is not addressed in the majority opinion, and is reserved for another day.

## II. Qualified Immunity of Individual Officers.

**A. Introduction.** I next address the fighting issue joined by the parties, namely, whether Iowa should adopt a qualified immunity doctrine patterned after the one adopted by the United States Supreme Court in its cases under 42 U.S.C. § 1983. The City and the individual defendants present us with a compendium of federal statutory immunity cases that they suggest should guide us in determining whether the individual defendants are entitled to an immunity shield to prevent an award of damages for injuries they caused through their unconstitutional conduct. Similarly, the State urges us to follow federal quasi-immunity doctrine for claims brought against state officers under the Iowa Constitution. The plaintiff takes the challenge head on, urging us not to follow federal quasi-

immunity law. That is the issue that the parties have briefed and asked us to decide.

**B. Rejection of Federal Statutory Qualified Immunity as a Model for Iowa Constitutional Law.**

1. *Overview.* I begin by emphasizing that the policy-oriented federal doctrine of statutory qualified immunity does not provide a model for determining whether individuals are entitled to qualified immunity for Iowa constitutional torts. The federal doctrine of statutory qualified immunity progressively dilutes legal norms, embraces numerous false assumptions, fails to recognize the important role of juries in restraining government, and is inconsistent with important tenants of Iowa law. We should not voluntarily drape our constitutional law with the heavy chains of indefensible doctrine. We should aim to eliminate fictions in our law and be honest and forthright on the important question of what happens when officers of the law commit constitutional wrongs that inflict serious reputational, emotional, and financial harms on our citizens.

2. *It's not the tail of the dog; it's the dog.* First, one must recognize what is at stake when a doctrine limits remedies available for a legal violation. The limitation of remedies is not a sideshow, collateral issue, or footnote in the development of the law. Remedial doctrine is at the heart of substantive law. As Karl Llewellyn wrote, a "[d]efect of remedy is [a] defect of right." Aaron Belzer, Comment, *The Audacity of Ignoring Hope: How the Existing Qualified Immunity Analysis Leads to Unremedied Rights*, 90 Denv. U. L. Rev. 647, 673 (2012) [hereinafter Belzer] (quoting Karl N. Llewellyn, *The Bramble Bush* 88 (1930)). As Chief Justice Marshall stated in *Marbury v. Madison*, "[I]t is a general and indisputable rule, that where there is a legal right, there is also a legal remedy by suit or action at law, whenever that right is invaded." 5 U.S. (1 Cranch) 137, 163 (1803)

(quoting 3 William Blackstone, *Commentaries on the Laws of England* 23 (1765–1769)). As Professor Akhil Reed Amar has more recently observed, governments acting unconstitutionally "must in some way undo the violation by ensuring that victims are made whole." Akhil Reed Amar, *Of Sovereignty and Federalism*, 96 Yale L.J. 1425, 1427 (1987) [hereinafter Amar].

A lack of remedy drives a stake in the heart of a substantive legal doctrine. In the words of Justice Harlan in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, contemporary modes of thought at the time of the United States Constitutional Convention reflected "modes of jurisprudential thought which appeared to link 'rights' and 'remedies' in a 1:1 correlation." 403 U.S. 388, 400 n.3, 91 S. Ct. 1999, 2007 n.3 (1971) (Harlan, J., concurring in the judgment). We should tread very carefully before we limit the scope of remedies for unconstitutional conduct because we are, in effect, cutting down the scope of the substantive rights involved. Make no mistake, this case is not about the tail on the dog. It is about the dog.

The notion that judges may create a "gap" between constitutional rights and the remedies afforded is untenable. The consequence of such a gap is to effectively reduce the constitutional protections afforded to the public. To the extent they are not enforced, the nice words in the constitution do not mean what they seem to mean.

3. *Search and seizure: the wrong place for trenching on remedies for constitutional torts.* Of all the places to engage in constitutional dilution through sharp remedial restriction, search and seizure law is the last place to do so. Constitutional protections related to search and seizure are fundamental to liberty. Under article I, section 8 of the Iowa Constitution, searches and seizures, subject to a few "jealously and carefully drawn

exceptions" where a warrant cannot practicably be obtained, are subject to the warrant requirement. *State v. Ochoa*, 792 N.W.2d 260, 285 (Iowa 2010) (quoting *State v. Strong*, 493 N.W.2d 834, 836 (Iowa 1992)). The warrant requirement means that the application must be in writing and not based on ephemeral oral assertions. *See Battani v. Grund*, 244 Iowa 623, 628, 56 N.W.2d 166, 170 (1952). The warrant application must establish the basis for the government's intrusive search and seizure action before the action is taken—the state may not rely on after-the-fact recasting of reasons to conform to the results of the search. *See State v. Angel*, 893 N.W.2d 904, 915 (Iowa 2017) (Appel, J., dissenting). The search or seizure must be based upon probable cause and not mere hunches. *See State v. McNeal*, 867 N.W.2d 91, 99 (Iowa 2015); *State v. Gogg*, 561 N.W.2d 360, 363 (Iowa 1997).

The importance of effective enforcement of search and seizure restrictions on government was not lost on the generation of lawyers and judges who witnessed the collapse of the rule of law in central Europe in the 1930s. As Chief Nuremburg Prosecutor Justice Robert Jackson so eloquently opined after his return from his assignment in immediate postwar Germany, search and seizure rights

> are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government.

*Brinegar v. United States*, 338 U.S. 160, 180, 69 S. Ct. 1302, 1313 (1949) (Jackson, J., dissenting). *See generally* Victoria A. Graffeo, *Robert H. Jackson: His Years as a Public Servant "Learned in the Law,"* 68 Albany L. Rev. 539, 546 (2005).

Regrettably, the United States Supreme Court has in recent decades announced a series of opinions that undercut search and seizure protections. *See* Silas J. Wasserstrom, *The Incredible Shrinking Fourth Amendment*, 21 Am. Crim. L. Rev. 257, 259–61 (1984). The limitation of constitutional remedies by the Supreme Court has been part of the trend of the Court to restrict the scope of constitutional protections in the context of search and seizure. *See id.* at 291–94, 292 nn.186–87, 300 & n.216. We must recognize that this case falls squarely within the recent efforts to limit protections that citizens have from arbitrary government search and seizure actions. The question cannot be avoided: should we dilute the search and seizure protections of our citizens enshrined in article I, section 8 of the Iowa Constitution through a judicially or legislatively created constitutional immunity of some kind?

The importance of claims brought under article I, section 1 of the Iowa Constitution cannot be rendered a mere appendage either. Article I, section 1 was purposefully placed at the beginning of the Bill of Rights. *See* 1 *The Debates of the Constitutional Convention of the State of Iowa* 103–04 (W. Blair Lord rep. 1857), [hereinafter *The Debates*], http://www.statelibraryofiowa.org/services/collections/law-library/iaconst. It makes the point of emphasizing "inalienable rights," which, I take it, includes rights that cannot be abrogated by the legislature, or this court. Further, the "free and equal" provision of article I, section 1 is at the heart of our government structure and provided the constitutional foundation to *Coger v. Northwestern Union Packet Co.*, an important and highly celebrated case prohibiting discrimination by a steamboat operator against a female passenger "partly of African descent." 37 Iowa 145, 147, 153–55 (1873). Like article I, section 8, this constitutional provision is not

the place to cut remedial corners. Indeed, it is an area requiring exceptional remedial vigilance.

In short, when citizens suffer potentially grievous harms from unconstitutional conduct in violation of article I, section 1 or article I, section 8, we should require the officials who engaged in the unconstitutional conduct to bear the burden of the loss. We should not allow the officials who engage in unconstitutional conduct to respond to the prayer of the harmed citizen with, "Aw, tough luck. Tut tut. Bye bye."

4. *Sandy foundation: historical common law fiction in federal statutory immunity cases.* In interpreting whether 42 U.S.C. § 1983 provides statutory qualified immunity, the United States Supreme Court has sometimes stated that the qualified immunity defense simply follows the common law that existed at the time of the legislation's passage in 1871. *See Nixon v. Fitzgerald*, 457 U.S. 731, 745–46, 102 S. Ct. 2690, 2699 (1982). But this overbroad generality is simply wrong.

It is true that at common law, judges and legislators acting within their appropriate authority were entitled to robust immunity. *See Pierson v. Ray*, 386 U.S. 547, 553–54, 87 S. Ct. 1213, 1217–18 (1967) (acts of judges); *Tenney v. Brandhove*, 341 U.S. 367, 376, 71 S. Ct. 783, 788 (1951) (acts of legislators). But the same degree of protection simply did not extend to officers of the Crown, who were expected "to be mulcted in damages for their errors of judgment." Ilan Wurman, *Qualified Immunity and Statutory Interpretation*, 37 Seattle U. L. Rev. 939, 987 (2014) [hereinafter Wurman]. As noted by Justice Brennan in *Bivens*, "Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty." 403 U.S. at 395, 91 S. Ct. at 2004 (majority opinion).

For example, the outrage of lawless search and seizure by government officials was recognized at common law in the *Wilkes* cases, where very large money judgments were entered against officials who, at the direction of Lord Halifax, ransacked private premises looking for tell-tale signs of who authored a scurrilous broadside critical of the Crown. *Wilkes v. Wood* (1763) 98 Eng. Rep. 489, 489, 498–99; *Huckle v. Money* (1763) 95 Eng. Rep. 768, 768–69; *Entick v. Carringto*n (1765) 95 Eng. Rep. 807, 807–08, 811, 818; *see Godfrey v. State,* 898 N.W.2d 844, 866–67 (Iowa 2017) (describing the cases).  These unlawful searches cost the officials involved a lot of money.  Schoolchildren know about the shot heard around the world, but we seem to have forgotten about the cases heard around the world—the *Wilkes* cases.

Plainly, as Lord Halifax learned to his financial embarrassment in the *Wilkes* cases, common law absolute immunities for judges and legislators did not apply "across the board" to officers of the Crown.  As Professor Jaffe pointed out many years ago, the claims of official immunity exclude "the historic liability of sheriffs and peace officers."  Louis L. Jaffe, *Suits Against Governments and Officers: Damage Actions*, 77 Harv. L. Rev. 209, 221–22 (1963); *see also* Max P. Rapacz, *Protection of Officers Who Act Under Unconstitutional Statutes*, 11 Minn. L. Rev. 585, 585 (1927) ("Prior to 1880 there seems to have been absolute uniformity in holding officers liable for injuries resulting from the enforcement of unconstitutional acts.").  The common law provenance of broad-brushed statutory qualified immunity asserted by the United States Supreme Court in its statutory qualified immunity cases is based on an incorrect view of common law history.

John Wilkes was a folk hero in the American colonies.  As noted by a leading Wilkes biographer, his "every move was followed in the American

press, and his victories over government celebrated in the colonies." Arthur H. Cash, *John Wilkes: The Scandalous Father of Civil Liberty* 2 (2006) [hereinafter Cash]. Wilkes corresponded with Samuel Adams and John Hancock, among others. *Id.* "The Commons House of South Carolina sent him fifteen hundred pounds and closed down the provincial government rather than obey the royal governor's demand to rescind the gift." *Id.* According to historian Merrill Jensen, by the end of 1768, " 'Wilkes and Liberty' was a toast from one end of the colonies to the other." *Id.* at 232 (quoting Merrill Jensen, *The Founding of a Nation: A History of the American Revolution, 1763–1776,* at 260 (1968)). Paul Revere made a silver punch bowl with the engraving "No General Warrants" and "Wilkes and Liberty." *See Ochoa,* 792 N.W.2d at 270. "Wilkes received letters of support from John Adams and Joseph Warren." *Id.* And in a deeply tragic example of irony, the parents of John Wilkes Booth named their son after Wilkes as a tribute to freedom against tyranny. *See* Josh Chafetz, *Impeachment and Assassination,* 95 Minn. L. Rev. 347, 389 (2010). While Wilkes may not be a celebrity today, he and the *Wilkes* cases were well-known by the founding and antebellum generations.

The interesting case of *Little v. Barreme* demonstrates recognition of the general common law approach to liability for unlawful searches and seizures. 6 U.S. (2 Cranch) 170 (1804). A Danish vessel, the *Flying Fish,* was seized by Captain George Little. *Id.* at 176. The underlying law authorized seizure only if the vessel was going *to* a French port. *Id.* at 177–78. The *Flying Fish* was coming *from* a French port. *Id.* at 176. President Adams, however, had issued instructions that vessels that were coming from French ports could be seized. *Id.* at 170.

Chief Justice Marshall observed that "[t]he first bias of my mind was very strong in favor of the opinion that though the instructions of the

executive could not give a right, they might yet excuse from damages." *Id.* at 179. He questioned whether a distinction could be drawn between military officers and civil officers, and between proceedings "in the country and those on the high seas." *Id.* In the end, though, Chief Justice Marshall recognized that civil officers generally are liable for their wrongs. *See id.* He determined that while the ship was "seized with pure intention" as a "consequence of orders from the legitimate authority," nevertheless "the [executive] instructions cannot change the nature of the transaction, or legalize an act which without those instructions would have been a plain trespass." *Id.* As noted by Professor William Baude, the thrust of the case is that "good-faith reliance did not create a defense to liability—what mattered was legality." William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45, 56 (2018) [hereinafter Baude].

Further, the Supreme Court has, in its constitutional immunity cases, confused the role of good faith as an element of a specific offense with the different and much broader notion of good-faith immunity. For instance, in *Pierson*, the Supreme Court cited the elements of the tort of false arrest at common law. 386 U.S. at 555, 87 S. Ct. at 1218. But the fact that bad faith and flagrancy are elements of certain common law torts is not a basis for a broadly framed, across-the-board constitutional immunity doctrine. *See* Baude, 45 Cal. L. Rev. at 59. And in *Harlow v. Fitzgerald*, the Court jettisoned subjective bad faith for objective bad faith, a clear departure from any approach to the common law immunities. 457 U.S. 800, 818–19, 102 S. Ct. 2727, 2738–39 (1982). This innovation had no basis at all in common law.

Even among members of the Supreme Court, the fiction that broad statutory qualified immunity under 42 U.S.C. § 1983 is supported by the common law is unraveling. At least three Justices have recognized that

the statutory qualified immunities caselaw, in fact, departs from common law precedents. For example, in *Wyatt v. Cole*, Justice Kennedy noted that the Court had "diverged to a substantial degree from the historical standards" of the common law and observed that statutory immunity was not supposed to be based upon "freewheeling policy choice[s]." 504 U.S. 158, 170, 112 S. Ct. 1827, 1835 (1992) (Kennedy, J., concurring) (alteration in original) (quoting *Malley v. Briggs*, 475 U.S. 335, 342, 106 S. Ct. 1092, 1096 (1986)). In a dissenting opinion in *Crawford-El v. Britton*, Justice Scalia noted that "our treatment of qualified immunity under 42 U.S.C. § 1983 has not purported to be faithful to the common-law immunities that existed when § 1983 was enacted." 523 U.S. 574, 611, 118 S. Ct. 1584, 1603 (1998) (Scalia, J., dissenting). Most recently, in *Ziglar v. Abbasi*, Justice Thomas observed that "we have diverged from the historical inquiry mandated by the statute." 582 U.S. ___, ___, 137 S. Ct. 1843, 1871 (2017) (Thomas, J., concurring in part and concurring in the judgment). The sandy foundation of federal statutory qualified immunity is not withstanding the test of time but rather is being washed away.

5. *Square pegs in round holes.* Using federal statutory qualified immunity doctrine to shape the immunity doctrine for state constitutional torts is forcing a square peg into a round hole. The federal law on qualified immunity has developed in the context of interpretation of 42 U.S.C. § 1983. There is no persuasive reason why federal statutory interpretation should be hurriedly, or deliberately, ripped out of the federal caselaw and frantically, or carefully, pasted into the North Western Reporter as Iowa state constitutional law. There is simply no reason to believe that the statutory interpretation provided by the United States Supreme Court is constitutionally required on the federal level, let alone required in an

interpretation of state constitutional provisions. *See* Seth P. Waxman & Trevor W. Morrison, *What Kind of Immunity? Federal Officers, State Criminal Law, and the Supremacy Clause*, 112 Yale L.J. 2195, 2209 (2003) ("It bears emphasizing that qualified immunity does not appear to be constitutionally required.").

6. *Missing the point: incorrect statutory interpretation of the Ku Klux Klan Act.* In any event, there is reason to question the prevailing federal *statutory* interpretation. Congress enacted 42 U.S.C. § 1983 in 1871 to fight the Ku Klux Klan. *See generally* Michael H. LeRoy, *Targeting White Supremacy in the Workplace*, 29 Stan. L. & Pol'y Rev. 107, 120–23 (2018) [hereinafter LeRoy] (describing the history surrounding the enactment of the Act). The statute, of course, says not one word about governmental immunities. *See* 42 U.S.C. § 1983 (2012). In early American history, the "strict rule of personal official liability" was well-established, "even though its harshness to officials was quite clear." David E. Engdahl, *Immunity and Accountability for Positive Governmental Wrongs*, 44 U. Colo. L. Rev. 1, 19 (1972). To the extent the statute merely captured common law precedent existing in the United States in 1871, it would not include broad qualified immunity for officers engaging in unlawful searches and seizures.

Further, the Reconstruction Era Congress was determined, at least in 1871, to address the horrific intimidation, terror, and violence visited on African-Americans by white supremacists who gained control of state and local governments in the states of the former confederacy. *See* LeRoy, 29 Stan. L. & Pol'y Rev. at 121–23. We should never forget that while the Civil War ended in 1865 for most Iowans, a bitter and brutal battle continued against African-Americans in the former slave states. *See Virginia v. Black,* 538 U.S. 343, 353, 123 S. Ct. 1536, 1544 (2003) ("Soon the Klan imposed 'a veritable reign of terror" throughout the South."

(quoting Stetson Kennedy, *Southern Exposure* 31 (1991))); Wadie E. Said, *Humanitarian Law Project and the Supreme Court's Construction of Terrorism*, 2011 BYU L. Rev. 1455, 1471–72 (characterizing the brutal tactics of the Klan to enforce white supremacy as organized terrorism).

The Civil Rights Act of 1866, which initiated the series of legislation that eventually included 42 U.S.C. § 1983, declared that it was "An Act to protect all Persons in the United States in their Civil Rights, *and furnish the Means of their Vindication.*" Civil Rights Act of 1866, ch. 31, 14 Stat. 27, 27. As Professor Gary Gildin has stressed, § 1983 "provides that 'every person' acting under color of state law who deprives an individual of federal constitutional rights 'shall be liable to the party injured.' " Gary S. Gildin, *Redressing Deprivations of Rights Secured by State Constitutions Outside the Shadow of the Supreme Court's Constitutional Remedies Jurisprudence*, 115 Pa. St. L. Rev. 877, 888–89 (2011) (quoting 42 U.S.C. § 1983). The legislative history includes a declaration from an opponent of the bill that the legislation has "no limitation whatsoever upon the terms that are employed." *Id.* at 889 (quoting *Monell*, 436 U.S. at 685 n.45, 98 S. Ct. at 2033 n.45). Representative Bingham saw the bill as embracing Justice Harlan's one-to-one relationship between rights and remedies and "declared the bill's purpose to be 'enforcement . . . of the Constitution on behalf of every individual citizen of the Republic . . . to the extent of the rights guaranteed to him by the Constitution.' " *Id.* at 888 n.39 (quoting *Monell*, 436 U.S. at 685 n.45, 98 S. Ct. at 2033 n.45). A supporter in the House of Representatives noted that the § 1983 is remedial and should be "liberally and beneficently construed" to afford a remedy to the victim of constitutional wrongs. *Id.* at 889 & n.41 (quoting *Monell*, 436 U.S. at 684, 98 S. Ct. at 2032). Robust qualified immunity for individuals committing

constitutional wrongs is completely inconsistent with the wording, the legislative history, and the challenging historical purpose of the statute.

7. *Unbalanced policy analysis.* Aside from erroneous appeals to common law and misconceptions about the contours of American history, qualified immunity for individual government officials is defended on policy grounds. It is suggested that without qualified immunity, the officials will be frozen because of fear of potential liability. This claim is unbalanced. If we are going to accept the premise that potential liability affects behavior, as advocates of immunities so fervently do, we need to look at the opposite side of the coin too, namely, if behavior is fundamentally affected by the *imposition* of tort liability, the *removal* of tort liability will also similarly impact behavior. If it is true that police conduct will be chilled by tort rules, then the granting of immunity will lead police to engage in more unconstitutional activities because they do not have to worry about potential liabilities. We must consider both halves of the deterrence walnut.

Indeed, at common law, an official's exposure to "being mulcted in damages was precisely the deterrent for errors of judgment." Wurman, 37 Seattle U. L. Rev. at 965. More recently, the NAACP Legal Defense Fund has explicitly called for a reexamination of the legal standards governing qualified immunity in light of police violence involving African-Americans. NAACP Legal Def. Fund, *Statement on U.S. Supreme Court Decision Expanding Qualified Immunity for Police* (Apr. 2, 2018), www.naacpldf.org/files/about-us/Kisela%20Hughes%20Decision%20Sta tement.pdf [https://perma.cc/2ACT-QPP5]. According to the NAACP view, more deterrence is needed. *Id.* Judge Jon Newman agrees, calling upon Congress to abolish the defense of qualified immunity in order to better control police misconduct. Jon O. Newman, *Here's a Better Way to Punish*

*the Police: Sue Them for Money*, Wash. Post (June 23, 2016), http://wapo.st/28R2Np4?tid=ss_mail&utm_term=.16d65eac7e49y [https://perma.cc/2CSG-2ERG]. The libertarian Cato Institute has joined the fray, noting "the deleterious effect [that qualified immunity] has on the ability of citizens to vindicate their constitutional rights, and the subsequent erosion of accountability among public officials that the doctrine encourages." Brief of the Cato Institute as Amicus Curiae Supporting Plaintiffs-Appellees and Affirmance at 1, *Williams v. Cline*, ___ F.3d. ___ (7th Cir. 2018) (No. 17–2603), https://object.cato.org/ sites/cato.org/files/pubs/pdf/williams-v-cline-cato-amicus-brief-motion.pdf [https://perma.cc/R6UU-E7AB]; *see also* Devon W. Carbado, *Blue-on-Black Violence: A Provisional Model of Some of the Causes*, 104 Geo. L.J. 1479, 1519–24 (2016) (examining problems presented by qualified immunity and indemnification).

8. *Stay in your own lane: judicial legislation.* Further, the jeremiads about chilling official conduct ring hollow. Advocates of sharp restrictions on judicial protection of individual rights generally are also advocates of legislative supremacy. Well, then let's give the legislature the power to enact policy. To the extent that the legislature wishes to prevent lack of constitutional immunity from chilling police conduct, it may enact an indemnity statute. *See* Wurman, 37 Seattle U. L. Rev. at 965–66, 987. Indeed, in the antebellum years, the question of whether to indemnify public officers for their illegal conduct was assigned to the legislative branch. *See* James E. Pfander & Jonathan L. Hunt, *Public Wrongs and Private Bills: Indemnification and Government Accountability in the Early Republic*, 85 N.Y.U. L. Rev. 1862, 1925 (2010) [hereinafter Pfander & Hunt]. The nineteenth century approach "was to hold the officer

accountable in court for violations of the victim's legal rights but then to indemnify the officer . . . through the legislative process." *Id.*

The federal courts have deprived the legislature of this policy choice by an aggressive imposition of judicially created immunity. The handwringing of the United States Supreme Court in its qualified immunity cases shows a dissatisfaction with the common law and with the failure of the legislative branch to enact policy preferences that the majority of the Court seems to prefer. Qualified immunity is thus simply judicial legislation—it reflects dissatisfaction with the failure of the legislative process to relieve individual officers of liability through indemnification and the achievement of the desired policy result through judicially legislating a policy of qualified immunity.

9. *The chewing and choking of constitutional rights.* The federal approach to statutory qualified immunity embraces a dynamic that has progressively chewed and choked potential remedies for constitutional violations. The federal approach requires a plaintiff to overcome qualified immunity by demonstrating that the officials involved engaged in violations of "clearly established rights." *Harlow*, 457 U.S. at 819, 102 S. Ct. at 2739. A key question, of course, is at what level of generality is this test imposed? The federal caselaw suggests that the level of generality has become increasingly specific—namely, that unless there is an authoritative, reported case that is nearly factually identical to the case in question, the constitutional right is not clearly established. *See Kerns v. Bader*, 663 F.3d 1173, 1191, 1198–99 (10th Cir. 2011) (Holloway, J., dissenting) (observing plaintiff would need to find a case nearly identical on the facts, a virtually impossible task); Belzer, 90 Denv. U. L. Rev. at 650 (arguing that the caselaw creates "an insurmountable hurdle" for

plaintiffs); Wurman, 37 Seattle U. L. Rev. at 944 (noting level of generality is crucial in qualified immunity context).

Further, in determining whether there has been a violation of constitutional rights, the federal courts jettisoned any subjective test in favor of a "reasonableness" test in determining whether the actions of the officers qualify for immunity. *See Harlow*, 457 U.S. at 819, 102 S. Ct. at 2739. The objective reasonableness test is, of course, so amorphous that some liability might have emerged for officials, so the federal caselaw has now tightened the screw another turn by replacing or supplementing the objectively reasonable standard with the new formulation of "entirely unreasonable." *Messerschmidt v. Millender*, 565 U.S. 535, 547, 132 S. Ct. 1235, 1245 (2012).

And, there is more. By now allowing, if not encouraging, courts not to reach the question of whether a constitutional violation actually occurred, but only whether the right involved was "clearly established," the constitutional immunity doctrine has prevented the development of substantive constitutional law by reducing the number of cases that address claims on the constitutional merits. *See Camreta v. Greene*, 563 U.S. 692, 705–06, 131 S. Ct. 2020, 2031 (2011) ("[O]ur usual adjudicatory rules suggest that a court *should* forbear resolving the [constitutional] issue. . . . Small wonder then, that a court might leave that issue for another day. But we have long recognized that this day may never come—that our regular policy of avoidance sometimes does not fit the qualified immunity situation because it threatens to leave standards of official conduct permanently in limbo." (Citations omitted.)). The federal constitutional immunity doctrine thus serves to limit the development of constitutional law by eliminating consideration of constitutional uncertainties in filed cases. Belzer, 90 Denv. U. L. Rev. at 685. Further,

the presence of difficult-to-meet constitutional immunity standards has dramatic impact in law offices where lawyers and putative clients weight the practicalities of bringing constitutionally based legal actions in the face of strong immunity headwinds. *See* Alexander A. Reinert, *Does Qualified Immunity Matter?*, 8 U. St. Thomas L.J. 477, 494–95 (2011) (noting "qualified immunity plays a large role in case selection" and "limit[s] the extent to which civil rights litigation tests the boundaries of the law"). The creation of artificial immunities for constitutional violations is bad news for the development of state constitutional law.

**C. Iowa Code Chapters 669 and 670.** Iowa Code chapters 669 and 670 are the Iowa Tort Claims Act and the Municipal Tort Claims Act. The Acts begin with the premise that state and local governments are generally liable for tortious acts as are ordinary citizens. The Acts, however, have sweeping exceptions.

The Iowa Tort Claims Act broadly exempts the state from liability for claims "arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." Iowa Code § 669.14(4) (2017). Further, the state is exempt from liability for any claims brought by an inmate. *Id.* § 669.14(6). These provisions, if enforced with respect to constitutional claims, would dramatically undermine the scope of available remedies in a wide variety of actions.

The Municipal Tort Claims Act also provides for liability of local government, subject to enumerated exceptions. *Id.* § 670.2(1). The exceptions are different than under the Iowa Tort Claims Act. *Compare id.* § 669.14, *with id.* § 670.4. The Municipal Tort Claims Act excludes from liability any claim arising out of an act or omission of an officer "exercising due care, in the execution of a statute, ordinance, or regulation . . . or

based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty." *Id.* § 670.4(1)(*c*). Further, claims for punitive damages are not allowed. *Id.* § 670.4(1)(*e*). Depending on interpretation, application of these Code provisions to situations where government officials cause grievous harm could dramatically reduce any possible recovery.

These statutory provisions are not of much value in determining whether there is qualified immunity for officers who commit constitutional torts. The very purpose of the Bill of Rights is to restrain the majoritarian branches of government. These provisions are distinctly antimajoritarian. It would be a fox-in-the-henhouse problem to permit the legislature to define the scope of protection available to citizens for violation of constitutional rights. As noted by Professor Amar, "When governments act ultra vires and transgress the boundaries of their charter, . . . their sovereign power to immunize themselves is strictly limited by the remedial imperative." Amar, 96 Yale L.J. at 1490.

**III. No Immunity Under Iowa Constitutional Law for Search and Seizure Claims.**

**A. Introduction.** Having rejected the federal model, I now turn to consider whether there is a basis for some kind of constitutionally based immunity for officers who violate state constitutional rights. In doing so, it is important to emphasize that we are not engaging in an act of statutory interpretation but instead an act of constitutional interpretation.

**B. First and Foremost: Emphasis in the Iowa Constitution on Bill of Rights.** As noted in *Godfrey*, the Iowa constitutional founders placed strong emphasis on the Bill of Rights provisions of the Iowa Constitution. 898 N.W.2d at 864. The Bill of Rights of the Iowa Constitution was deliberately designed "to put upon record every

guarantee that could be legitimately placed [in the constitution]." *Id.* (quoting 1 *The Debates* at 100 (alteration in original)). The placement of the Bill of Rights in the very first article in the Iowa Constitution, ahead of articles describing legislative and executive power, was not a result of happenstance. According to George Ells, Chair of the Committee on the Preamble and Bill of Rights, "the Bill of Rights is of more importance than all the other clauses in the Constitution put together, because it is the foundation and written security upon which the people rest their rights." *Id.* (quoting *The Debates* at 103). Given the obvious importance of the Iowa Bill of Rights in the state constitutional scheme, it must be effectively enforced. *See id.* at 865.

**C. "Thoroughly Well-Settled": Iowa Caselaw Imposing Damages on Officials for Unconstitutional Searches and Seizures.** As we noted in *Godfrey*, the Iowa founding generation was well aware of the English cases where officers of the Crown were liable for substantial damages for unlawful searches and seizures. *Id.* at 866–67. In *Sanders v. State,* the Iowa Supreme Court cited *Entick,* using as its source Howell's State Trials, a popular compendium of English law cases. 2 Iowa 230, 239 (1855); *see Godfrey,* 898 N.W.2d at 867. In *McClurg v. Brenton,* we reversed a trial court dismissal of a damages action against a mayor, a chief of police, and a captain of police where a search was conducted without a warrant. 123 Iowa 368, 369, 371–72, 98 N.W. 881, 881–83 (1904). A few years later, we reaffirmed the notion that the right of citizens to be secure in person and property against wrongful searches and seizures is "zealously safeguarded and has express recognition in our state Constitution." *Krehbiel v. Henkle* (*Krehbiel I*), 142 Iowa 677, 679–80, 121 N.W. 378, 379–80 (1909). We further stated that it was "thoroughly well settled" that "a violation of this right without reasonable ground therefor gives the injured party a right of

action." *Id.* at 680, 121 N.W. at 380. We later affirmed an award of punitive damages in the case based upon the defendant's "wanton and reckless" disregard of the plaintiff's rights. *Krehbiel v. Henkle* (*Krehbiel II*), 152 Iowa 604, 606, 129 N.W. 945, 945, modified on other grounds, 152 Iowa 604, 607, 133 N.W. 115, 115 (1911) (per curiam).

The majority cites *Krehbiel I* in support of its view that in Iowa, malice or want of probable cause must be shown to support a damage action for unconstitutional search and seizure. 142 Iowa at 680, 121 N.W. at 380. But the tort involved in *Krehbiel* was malicious prosecution. *Id.* Because the issue was framed as malicious prosecution, malice was an element of the offense. *Id.* The reference in the case to whether there was a reasonable ground for the search does not appear to be an assertion of immunity but is consistent with the notion that a search is reasonable if it is undertaken pursuant to a valid warrant or undertaken pursuant to a valid exception to the warrant requirement. *See* Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. 547, 576–90 (1999).

The majority also cites the cases of *Hetfield v. Towsley*, 3 Greene 584 (Iowa 1852), and *Howe v. Mason*, 12 Iowa 202 (1861). These cases involve judicial immunity, *Howe*, 12 Iowa at 203–04; *Hetfield*, 3 Greene at 585, a concept well-recognized at common law and distinct from a claim against officers engaged in search-and-seizure-type activities, *see, e.g.*, *Pierson*, 386 U.S. at 553–54, 87 S. Ct. at 1217–18. The majority opinion thus conflates apples and oranges. Judges historically have been absolutely immune because of the peculiar characteristics of and the safeguards built into the judicial process, including rights of appeal. *See Butz v. Economou*, 438 U.S. 478, 512, 98 S. Ct. 2894, 2913 (1978). Such absolute immunity has not historically been extended to other government

officials exercising different governmental functions. It is wrong to suggest that *Hetfield* and *Howe* stand for the proposition that immunity should be extended to executive branch officials charged with violating article I, section 1 and article I, section 8 of the Iowa Constitution when the official functions involved are materially different. *See Butz,* 438 U.S. at 511, 98 S. Ct. at 2913 ("Judges have absolute immunity not because of their particular location within the Government but because of the special nature of their responsibilities.").

The majority also miscites *Plummer v. Harbut,* 5 Iowa 308 (1857). In this unlawful search and seizure case, the plaintiff was deprived of compensatory damages not because of the good faith of the officers, as claimed by the majority, but because a party seeking to recover damages, for the seizure and destruction of intoxicating liquors, must show that he possessed them with a lawful intent. *Id.* at 312–13. Because possession of the intoxicating liquor was unlawful, compensatory damages were not available. *Id.* at 313. The good-faith discussion in the case was not directed to the issue of compensatory damages, as the majority suggests, but to the issue of punitive damages. *Id.* at 314. As the *Plummer* court stated, "Where a ministerial officer acts in good faith, he is not liable to exemplary damages for an injury done." *Id.* In the *Plummer* case, the proposition that "good faith" in the search and seizure context was not relevant to the issue of compensatory damages but only to the issue of punitive damages.

Finally, the majority dismisses language in *Girard v. Anderson* that directly and plainly states, "A violation of the state and federal constitutional provisions against the unreasonable invasion of a person's home gives the injured party a right of action for damages for unlawful breaking and entering." 219 Iowa 142, 148, 257 N.W. 400, 403 (1934).

The majority rejects the relevance of *Girard* by stating that the case involved an intrusion by a private party. That is true enough, but among the cases cited by the *Girard* court in support of the statement that an injured party has a cause of action was *McClurg*, a case involving misconduct of officials. *See id.* at 148, 257 N.W. at 403 (citing *McClurg*, 123 Iowa 368, 98 N.W. 881). By citing *McClurg*, it is hard to believe the *Girard* court subscribed to the narrow interpretation embraced by the majority.

Recently in *Godfrey*, we stressed the need for effective enforcement of constitutional norms through private causes of action to recover for harms caused by unconstitutional conduct. 898 N.W.2d at 865. We quoted Justice Harlan's concurrence in *Bivens* for the proposition that "the judiciary has a particular responsibility to assure the vindication of constitutional interests." *Id.* (quoting *Bivens*, 403 U.S. at 407, 91 S. Ct. at 2010 (Harlan, J., concurring in the judgment)).

**D. Constitutional Caselaw from Other Jurisdictions on the Question of Qualified Immunity Under State Constitutional Provisions.** The state courts are divided on the question of whether there should be some kind of immunity doctrine that relieves individual officers of potential liability for constitutional wrongs.

Some cases follow the United States Supreme Court approach to statutory qualified immunity in the interpretation of their state constitutions. A good example of an unreflective "me too" case is *Moresi v. Department of Wildlife & Fisheries*, 567 So. 2d 1081 (La. 1990). There, the Louisiana court wrote,

> The same factors that compelled the United States Supreme Court to recognize a qualified good faith immunity for state officers under § 1983 require us to recognize a similar

immunity for them under any action arising from the state constitution.

*Id.* at 1093. Needless to say, this uncritical analysis, for all the reasons expressed above, is unpersuasive.

On the other hand, the Maryland Court of Appeals, in *Clea v. Mayor of Baltimore*, held that city officials were not entitled to immunity for violations of individuals' rights under the Maryland Declaration of Rights. 541 A.2d 1303, 1314 (Md. 1988), *superseded by statute on other grounds*, Md. Code Ann., State Gov't § 12-101(a), *as recognized in D'Aoust v. Diamond*, 36 A.3d 941, 962 (Md. 2012). In *Clea*, the plaintiffs brought both an ordinary tort suit and a constitutional claim against several officials including a police officer, for an allegedly unlawful search of the plaintiffs' home. *Id.* at 1304. The defendant police officer asserted he was entitled to qualified immunity. *Id.*

The *Clea* court held that while the police officer was immune from the ordinary tort claims because he did not act with malice, the immunity statute could not be lawful as applied against claims under the Maryland Declaration of Rights. *Id.* at 1311, 1312. The court stated that "there are sound reasons to distinguish actions to remedy constitutional violations from ordinary tort suits." *Id.* at 1314. The court emphasized "[t]he purpose of a negligence or other ordinary tort action is not specifically to protect individuals against government officials or to restrain government officials," but only "to protect one individual against another individual." *Id.*

On the other hand, the *Clea* court noted that the constitutional provisions in the Declaration of Rights of the Maryland Constitution were "specifically designed to protect citizens against certain types of unlawful acts by government officials." *Id.* According to the *Clea* court,

> To accord immunity to the responsible government officials, and leave an individual remediless when his constitutional rights are violated, would be inconsistent with the purpose of the constitutional provisions. It would also . . . largely render nugatory the cause of action for violation of constitutional rights recognized [in Maryland's *Godfrey*-type cases].

*Id.*

The Montana Supreme Court has adopted an approach similar to that in *Clea.* In *Dorwart v. Caraway*, the Montana Supreme Court rejected qualified immunity for state constitutional torts. 58 P.3d 128, 140 (Mont. 2002). The *Dorwart* court agreed with the analysis presented in *Clea. Id.* at 139. It also emphasized, however, unique aspects of the state constitution, including provisions prohibiting local governments from immunity from suit except as provided by a two-thirds vote of each house of the legislature. *Id.* at 139–40.

Also instructive is *Corum v. University of North Carolina ex rel. Board of Governors*, 413 S.E.2d 276 (N.C. 1992). In *Corum*, the North Carolina Supreme Court considered an action brought by a discharged faculty member alleging his termination violated his right to free speech. *Id.* at 280. The defendants included the university and various university officials. *Id.* at 282. The North Carolina Supreme Court held that a direct action to enforce free speech under the North Carolina Constitution was essential to preserve the rights guaranteed by that provision. *Id.* at 289.

The *Corum* court also considered the question of whether the doctrine of sovereign immunity had any application in the case. *Id.* at 291. The court held that it did not. *Id.* According to the court, "the doctrine of sovereign immunity cannot stand as a barrier to North Carolina citizens who seek to remedy violations of their rights guaranteed by the Declaration of Rights [in the state constitution]." *Id.* The court noted that the Declaration of Rights is the first article in the state constitution and

emphasized its primacy in the minds of the North Carolina framers. *Id.* at 289–90. The court stated,

> It would indeed be a fanciful gesture to say on the one hand that citizens have constitutional individual civil rights that are protected from encroachment actions by the State, while on the other hand saying that individuals whose constitutional rights have been violated by the State cannot sue because of the doctrine of sovereign immunity.

*Id.* at 291. While the *Corum* court spoke in terms of sovereign immunity and not qualified immunity, it appeared to be considering an immunity claim made by an individual defendant, i.e., the plaintiff's immediate supervisor and an official at the university involved in the case, and not a claim made by the university. *See id.* at 281, 292.

**E. Impact of *Godfrey* on the Enforcement of Constitutional Provisions.** In *Godfrey*, we held that the due process and equal protection provisions of the Iowa Constitution are self-executing and that citizens have a direct action for damages caused by unconstitutional conduct under the Iowa Constitution. 898 N.W.2d at 846–47, 871–72. However, we specifically left open the question of whether government officials were entitled to qualified immunity with respect to direct claims brought under the Iowa Constitution. *Id.* at 879 (plurality opinion). While we reserved the question of qualified immunity, it is important that the general principles of *Godfrey*, which held citizens have the right to bring direct claims under the Constitution, be consistently applied in this case, addressing the scope of the direct remedies recognized in *Godfrey*.

In *Godfrey*, we emphasized that "[i]f the[] individual rights in the very first article of the Iowa Constitution are to be meaningful, they must be effectively enforced." *Id.* at 865 (majority opinion). We quoted Justice Harlan for the proposition that "the judiciary has a particular responsibility to assure the vindication of constitutional interests." *Id.*

(quoting *Bivens*, 403 U.S. at 407, 91 S. Ct. at 2010). We noted, "It would be ironic indeed if the enforcement of individual rights and liberties in the Iowa Constitution, designed to ensure that basic rights and liberties were immune from majoritarian impulses, were dependent on legislative action for enforcement." *Id.* We explained that the Iowa Constitution put its Bill of Rights in article I, indicating the Bill of Rights' primacy, and that the Iowa Constitution generally tends to limit the scope of legislative powers. *Id.* at 864–65. We stated, "We cannot imagine the founders intended to allow government wrongdoers to set their own terms of accountability through legislative action or inaction." *Id.* at 866. It is plain from *Godfrey* that constitutional rights must be effectively enforced, the court is the principle institution of government to ensure that such effective enforcement occurs, and action or inaction of the legislature cannot be an effective barrier to wholesome judicial enforcement of the Iowa Bill of Rights. *See id.* at 865–66. We must not abandon these *Godfrey* principles today in this companion case.

In *Godfrey*, we also discussed the availability of punitive damages for constitutional wrongs. *Id.* at 875–79 (plurality opinion). Three members of the court concluded that because the Iowa Civil Rights Act (ICRA) did not include punitive damages, it did not preempt a direct constitution claim alleging that the defendants acted unconstitutionally in violation of the equal protection clause of the Iowa Constitution. *Id.* at 879. In a separate opinion, Chief Justice Cady came to the conclusion that while lack of punitive damages could lead to a finding that a statutory remedy is inadequate, it was not under the specific facts of Godfrey's case. *Id.* at 880–81 (Cady, C.J., concurring in part and dissenting in part).

There is substantial authority to support the position that, in a search and seizure case, punitive damages should be allowed. The

damages awarded in the *Wilkes* cases exceeded the injury. *See Godfrey*, 898 N.W.2d at 866 (majority opinion) (explaining that Wilkes was awarded £1000 and Huckle £300); *see also 1763 Pounds in 2017*, UK Inflation Calculator, https://www.officialdata.org/1763-GBP-in-2017?amount=1300 [https://perma.cc/CG72-D7HL] (last visited June 26, 2018) (calculating that £1300 in 1763 is about £245,000 in 2017). In *Huckle*, the amount of awarded damages was fifteen times the actual damages, with the court observing,

> I think they have done right in giving exemplary damages. To enter a man's house by virtue of a nameless warrant, in order to procure evidence, is worse than the Spanish Inquisition; a law under which no Englishman would wish to live an hour; it was a most daring public attack made upon the liberty of the subject.

*Godfrey*, 898 N.W.2d at 866 (quoting *Huckle*, 95 Eng. Rep. at 769); *see also Simpson v. McCaffrey*, 13 Ohio 508, 522–23 (1844) (en banc) (allowing "damages beyond compensation" for search and seizure violations). Iowa followed the common law approach to punitive damages in *Krehbiel II*, 152 Iowa at 606, 129 N.W. at 945. In *Krehbiel II*, the court affirmed an award of punitive damages on the ground that such damages were available for conduct that "was wanton and reckless and in disregard of the plaintiff's rights." *Id.*

Chief Justice Cady's concurring opinion in *Godfrey* provided the deciding vote on the question of whether the lack of a punitive damages remedy in the ICRA prevented the Act from preempting a direct constitutional claim. 898 N.W.2d at 880–81 (Cady, C.J., concurring in part and dissenting in part). Chief Justice Cady concluded that on the facts of the *Godfrey* case, the lack of a punitive damages remedy did not cause the remedies in the ICRA to be inadequate. *Id.* Chief Justice Cady noted that the ICRA provides attorney's fees, a remedy that might

compensate for a lack of availability of punitive damages. *Id.* at 881. He acknowledged, however, that "[i]n the appropriate case, a remedy of punitive damages may be necessary to vindicate a plaintiff's constitutional rights." *Id.* But, according to Chief Justice Cady,

> when the claimed harm is largely monetary in nature and does not involve any infringement of physical security, privacy, bodily integrity, or the right to participate in government, and instead is against the State in its capacity as an employer,

punitive damages are not a necessary remedy. *Id.* This search and seizure case, of course, *does* involve infringement of physical security and bodily integrity. Under Chief Justice Cady's concurring opinion, punitive damages may well be necessary to vindicate the plaintiff's constitutional rights, just as it was in *Krehbiel. See id.*; *Krehbiel II*, 152 Iowa at 606, 129 N.W. at 945.

**F. Discussion.** The mere lifting of federal statutory qualified immunity doctrine and supplanting it into analysis of constitutional claims under the Iowa Constitution is a nonstarter. The question is whether we should independently develop a judge-made doctrine of qualified immunity to relieve public officials from liability for damages arising from their unlawful conduct as a supplement to the constitutional text contained in article I of the Iowa Constitution.

I conclude that we should not manufacture a qualified immunity doctrine for constitutional wrongs of public officials. Our state constitutional tradition places strong emphasis on the Bill of Rights. *See Godfrey*, 898 N.W.2d at 864 (majority opinion). There can simply be no doubt that limiting the remedies available for violations of constitutional provisions limits the substantive protections of those constitutional provisions for all practical purposes. Justice Harlan was spot-on when he observed that the relationship between substance and remedy is one-on-

one. *See Bivens*, 403 U.S. at 400 n.3, 91 S. Ct. at 2007 n.3. No one can plausibly argue otherwise.

There can be little doubt that the Bill of Rights in the Iowa Constitution was intentionally placed in article I to emphasize its primacy in the constitutional scheme. It precedes articles establishing executive and legislative powers. The notion that legislative powers in article III of the Iowa Constitution could eviscerate the Bill of Rights in article I is a topsy-turvy approach to our state constitutional structure. Further, the prominent English common law cases where government officials were found liable for search and seizure violations were well known in the colonies and to lawyers and judges at the time of the Iowa constitutional convention, as demonstrated by a citation to *Entick* by the Iowa Supreme Court in 1855. *See, e.g.*, *Godfrey*, 898 N.W.2d at 866–67; *Sanders*, 2 Iowa at 239. Our early search and seizure cases tend to reinforce the notion that money judgments against officials were an appropriate way to compensate plaintiffs and deter future misconduct. *See, e.g.*, *Krehbiel II*, 152 Iowa at 606, 129 N.W. at 945; *McClurg*, 123 Iowa at 369–70, 98 N.W. at 881–82. We should not dilute the remedy with a qualified immunity doctrine.

This is especially true when it comes to search and seizure issues. In *State v. Tonn*, we noted that "[a] trespassing officer is liable for all wrong done in an illegal search or seizure." 195 Iowa 94, 106, 191 N.W. 530, 535 (1923), *overruled on other grounds by State v. Cline*, 617 N.W.2d 277, 291 (Iowa 2000) (en banc), *overruled on other grounds by State v. Turner*, 630 N.W.2d 601, 606 n.2 (2001). Echoing the sentiments of judges in the *Wilkes* cases and anticipating the later views of Justice Jackson in *Brinegar*, we emphasized that the right against unreasonable searches and seizures was "a sacred right, and one which the courts will rigidly enforce."

*Id.* To embrace qualified immunity diluting the ability to enforce search and seizure law hardly elevates the right to "sacred status" or provides "rigid enforcement."

The "rigid enforcement" of search and seizure law was reflected in *Cline.* In *Cline,* we considered whether we should adopt a good-faith exception to the exclusionary rule for search and seizure violations under article I, section 8 of the Iowa Constitution. *Id.* at 288. We refused to do so. *Id.* at 292–93. If we adopted such a rule, we pointed out, the standard would be "close enough is good enough." *Id.* at 290 (quoting *State v. Marsala,* 579 A.2d 58, 68 (Conn. 1990)). It would, "in effect, remove the probable cause requirement from [article I, section 8]." *Id.* (quoting *People v. Sundling,* 395 N.W.2d 308, 314 (Mich. Ct. App. 1986), *abrogated on other grounds by People v. Russo,* 487 N.W.2d 698, 706 & n.31 (Mich. 1992)). Quoting a New Mexico court, we emphasized that the constitution was designed "to create more than 'a code of ethics under an honor system.' " *Id.* at 291 (quoting *State v. Gutierrez,* 863 P.2d 1052, 1067 (N.M. 1993)). Further, we noted that "[t]he reasonableness of a police officer's belief" in the lawfulness of his or her conduct "does not lessen the constitutional violation." *Id.* at 292.

This case is the civil counterpart of *Cline.* If we disallowed a good-faith defense in a criminal case on the question of admission of evidence, we certainly ought to allow a wronged citizen to seek damages for harm caused by the unconstitutional conduct of state or local government officials. And we should not lightly glide over the cautions of Justice Jackson that "[u]ncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government." *Brinegar,* 338 U.S. at 180, 69 S. Ct. at 1313.

Further, it is critically important that state officials are not above the law or even perceived to be above the law when it comes to enforcement of provisions of article I against state and local governments. As noted by the New York Court of Appeals in *Brown v. State*,

> no government can sustain itself, much less flourish, unless it affirms and reinforces the fundamental values that define it by placing the moral and coercive powers of the State behind those values. When the law immunizes official violations of substantive rules because the cost or bother of doing otherwise is too great, thereby leaving victims without any realistic remedy, the integrity of the rules and their underlying public values are called into serious question.

674 N.E.2d 1129, 1144 (N.Y. 1996).

As noted above, the claim that local officials will be deterred by the possibility of tort liability, is unbalanced. The opposite view—that without tort liability there will be less incentive to follow constitutional dictates—must be considered as well.

In any event, the basic premise that qualified immunity is needed to prevent overdeterrence of official conduct has little support. A recent study by Professor Joanna Schwartz confirms what one might suspect, namely, that at least with respect to police officers, local governments almost always indemnify for settlements and judgments arising out of misconduct lawsuits. *See* Joanna C. Schwartz, *Police Indemnification*, 89 N.Y.U. L. Rev. 885, 912 (2014). Specifically, the Schwartz study found that in the forty-four largest jurisdictions studied, police officers paid .02% of the over $730 million paid for misconduct suits between 2006 and 2011. *Id.* at 960. In the thirty-seven smaller police departments included in the study, Schwartz found there were no officer contributions towards settlements and judgments during that time. *Id.* In short, according to Schwartz, in many jurisdictions "officers are more likely to be struck by

lightning than they are to contribute to a settlement or judgment in a police misconduct suit." *Id.* at 914. The fact that officers are almost always indemnified undercuts one of the primary arguments in favor of the immunity doctrine—that without it, officers will be deterred from engaging in appropriate activities for fear of the financial consequences of a wrong decision.

Whether or not to indemnify local officials for their unconstitutional conduct is a policy matter that the Iowa legislature has already decided. Iowa Code section 669.21 indemnifies state officials against claims, including constitutional claims, subject to a few exceptions. Iowa Code § 669.21. Likewise, section 670.8 indemnifies municipal officials "against any tort claim or demand," subject to a few exceptions. *Id.* § 670.8. We have no occasion to develop a doctrine to relieve individual municipal officers from potential liability for constitutional wrongs—that has been done by other branches of government, just as it was in the antebellum period before the modern United States Supreme Court developed its innovative approach to qualified immunity. *See* Pfander & Hunt, 85 N.Y.U. L. Rev. at 1925–26.

The majority has created a "negligence" immunity to violations of search and seizure prohibitions under article I, section 8 of the Iowa Constitution, largely based on the work of Professor John Jeffries. As Professor Jeffries himself has noted, his approach "is opposed by the weight of academic opinion, which favors strict liability for all constitutional violations." *See* John C. Jeffries Jr., *Disaggregating Constitutional Torts*, 110 Yale L.J. 259, 262 n.16 (2000); *see also* Amar, 96 Yale L.J. at 1490–91; Mark R. Brown, *The Demise of Constitutional Prospectivity: New Life for* Owen*?,* 79 Iowa L. Rev. 273, 311–12 (1994); Harold S. Lewis Jr. & Theodore Y. Blumoff, *Reshaping Section 1983's*

*Asymmetry*, 140 U. Pa. L. Rev. 755, 756 (1992); Sheldon Nahmod, *Constitutional Damages and Corrective Justice: A Different View*, 76 Va. L. Rev. 997, 1019 (1990); Christina B. Whitman, *Government Responsibility for Constitutional Torts*, 85 Mich. L. Rev. 225, 229–30 (1987) (endorsing strict governmental liability for constitutional violations). There is nothing wrong with following the minority view in academia or, for that matter, the minority view in the courts. But the reasoning of the majority view, which is largely expressed in the body of this opinion, is worth considering. The majority in this case pretty much ignores it.

Rather than follow the state's motto, "Our Liberties We Prize and Our Rights We Will Maintain," the majority follows an approach that suggests "Our Liberties Are Transient and Our Rights Are Expendable." There is no sound policy basis to adopt such a negligence exception under article I, section 8 of the Iowa Constitution, particularly when individual municipal officers are indemnified for most claims that arise out of their official acts. *See* Iowa Code § 670.8. The majority has no response to this point. And how interesting it is that while the majority is concerned that government conduct will be chilled, it is not at all concerned that by granting immunity, unconstitutional conduct may be encouraged. And wholly absent from the majority opinion is any concern at all for a citizen who may suffer grievous harm as a result of the unconstitutional conduct of a government official. In effect, the majority has moved article I of the Iowa Constitution from its place of primacy and made it article V, behind the provisions establishing executive and legislative power. According to the majority, the emphasis in the Iowa Constitution is not on rights but government power.

In addition, the negligence standard could be applied in an unsound fashion to chew and choke potential liability. The search and seizure

provision of article I, section 8 uses the term "unreasonable." We have observed that the term cannot be regarded as an open-ended, stand-alone "reasonableness" test shorn from its linguistic and historical context. *See Ochoa*, 792 N.W.2d at 289. I fear, however, that some members of the court will take the ahistorical approach and see reasonableness as the touchstone of search and seizure law and then will, in light of this opinion, frame the immunity question in the search and seizure context as, "Was it reasonable for the officer to believe his or her conduct was reasonable?" *See Anderson v. Creighton*, 483 U.S. 635, 664 & n.20, 107 S. Ct. 3034, 3052 & n.20 (1987) (Stevens, J., dissenting). Such double counting of "reasonableness," if it occurs, would eviscerate enforcement of article I, section 8. Double counting reasonableness seems to be a fantastic result, but the lack of sensitive in the majority opinion to the enforcement of search and seizure rights does not give me high confidence that a highly distorted approach to immunity will not be applied in future search and seizure cases under article I, section 8. If a reasonableness-on-reasonableness approach does apply, the enforceability of the search and seizure provisions of the Iowa Constitution will be geometrically undermined.

Further, although the majority eschews *Harlow*, it will be interesting to see whether the concept of "clearly established rights" creeps back in under the banner of negligence on an as-needed basis to defeat claims of compensation. *See* 457 U.S. at 818, 102 S. Ct. at 2738. If it does, of course, the claim in the majority rejecting *Harlow* as having no place in Iowa law will be overstated.

In any event, for search and seizure cases in Iowa individual officers will now have a judge-created immunity based upon a due-care or negligence standard. The judge-created negligence standard is an

amorphous one but presumably follows the law of torts. If so, whether immunity is available will, in many cases, depend upon the fact finder's evaluation of the reasonableness of police compliance with constitutional requirements under all the facts and circumstances.

In the future, it will be interesting to see if the majority fashions additional judge-made rules in the application of its negligence standard to further prevent persons from obtaining remedies for constitutional harms inflicted by government officials. Specifically, we must wait and see if under the rubric of negligence, the court allows the return of either "clearly established rights" approach of *Harlow,* or applies the reasonableness-on-reasonableness approach to undercut constitutional claims, as I have described above. If so, the substantial harm caused by this majority opinion will be worse than advertised and liability for serious article I, section 1 and article I, section 8 violations may be more fictitious than real.

There is also some ominous language in the majority opinion suggesting that various provisions of Iowa Code chapters 669 and 670 might be used to ensure that Iowa citizens cannot recover for the constitutional harms caused by government officials. As indicated above, application of legislative restrictions on the ability of private citizens to recover for constitutional harms imposed on them by the government has a fox-in-the-henhouse quality. The very suggestion, for instance, that Iowa Code section 669.14(4), which prohibits "[a]ny claim [for damages] arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights," is a legislatively created vehicle to prevent citizens from recovering from grievous constitutional harm is astounding. The idea that the government might be immune from liability

for an unconstitutional beating using excessive force, for example, is what one might expect in an authoritarian state, not a democracy. Further, the suggestion that punitive damages may not be awarded for constitutional torts, as suggested in Iowa Code section 670.4(1)(*e*), would be absolutely astounding to the founding and antebellum generations so familiar with the *Wilkes* cases. If there are to be any cases where private citizens who are harmed by unconstitutional conduct are to be prevented from being compensated by the officers who caused the harm, that decision should be determined by the court and not the legislature.

## IV. Conclusion.

The majority opinion is misguided. It does not mention the role of the historic *Wilkes* cases and the dramatic impact these cases had on American law—a part of history, apparently, that is best forgotten. It embraces a constitutional "gap" theory and fails to recognize that rights and remedies, as Justice Harlan so eloquently pointed out in *Bivens*, have a 1:1 correlation and that the reduction in the scope of remedies necessarily involves a reduction in the scope of the constitutional protections for citizens. *See* 403 U.S. at 400 n.3, 91 S. Ct. at 2007 n.3. The majority speculatively declares that liability for damage caused by unconstitutional conduct may overdeter officials from engaging in their duties but remarkably fails to recognize that a nonliability rule may have an equal and opposite effect: *underdeterence* of unconstitutional conduct. The majority's finding that the speculative overdeterrence of actions of officials is weighty while the risk of underdeterrence of unconstitutional conduct infringing on individual rights is not mentioned *at all*, suggests a results-oriented jurisprudence that favors government officials who inflict unconstitutional harms over citizens who endure them. Further, the majority opinion ignores the fact that if overdeterrence is a problem, the

legislature is free to provide indemnity for individual officers, which the Iowa legislature has largely done. *See* Iowa Code § 669.21; *id.* § 670.8. The majority's vague suggestion that sweeping statutory immunities might be a source of law to undermine the protections of article I of the Constitution is unsound as a matter of constitutional law and fails to recognize the fundamental role that article I rights play in limiting the exercise of government power by the executive and legislative branches of government. The majority fails to recognize that granting immunity to officials for unconstitutional conduct leaves the burden of the harm from that unconstitutional conduct on the injured citizen instead of on the officials acting unconstitutionally.

The majority states that it has thrown *Harlow* overboard. Whether the ghost of *Harlow* will reemerge in another form remains to be seen. And just how great a barrier the negligence immunity standard will be to prevent injured citizens attempting to recover from the unconstitutional conduct of government officers will depend on future caselaw.

For the above reasons and the other reasons expressed in this opinion, I dissent.

Hecht, J., joins this dissent.